**Paula PERRY, Plaintiff–Appellant,**

v.

**Patricia A. McDONALD, Commissioner of the Vermont Department of Motor Vehicles, in both her personal and official capacities; and Michael A. Smith, former Motor Vehicle Unit Supervisor for Registration and License Information, in both his personal and official capacities, Defendants–Appellees.**

Docket No. 00–7869.

United States Court of Appeals, Second Circuit.

Argued April 3, 2001.

Decided Oct. 17, 2001.

David Putter, Montpelier, VT, for Plaintiff–Appellant.

Bridget C. Asay, Assistant Attorney General for the State of Vermont, Montpelier, VT, for Defendants–Appellees.

Before: OAKES, KEARSE, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

The questions presented are whether there is a First Amendment right to use special license plates bearing the letters "SHTHPNS," and whether a car registrant's due process rights under the Fourteenth Amendment are violated when a state department of motor vehicles revokes these plates after the department realizes that they have been issued in error. We answer both questions in the negative and therefore affirm.

Paula S. Perry ("Paula Perry" or "Perry") appeals from a June 21, 2000 judgment of the United States District Court for the District of Vermont (J. Garvan Murtha, *Chief Judge*) granting summary judgment for defendants Patricia A. McDonald, then-Commissioner of the Vermont Department of Motor Vehicles ("Vermont DMV" or "DMV"), and Michael A. Smith, a former Motor Vehicle Unit Supervisor for Registration and License Information at the DMV, and dismissing Perry's claims under the First and Fourteenth Amendments. Adopting the recommendation and report of Magistrate Judge Jerome J. Niedermeier on the First Amendment claim, and issuing its own opinion on the Fourteenth Amendment claim, the District Court held that McDonald and Smith did not violate Perry's constitutional rights by revoking her specially requested license

plates ("vanity plates"), which bear the letters "SHTHPNS."

We conclude that (1) Perry does not have a First Amendment right to use vanity plates bearing the letters "SHTHPNS"; and (2) defendants did not violate Perry's due process rights under the Fourteenth Amendment when they revoked these plates after issuing them in error. Accordingly, we affirm the judgment of the District Court.

## I.

The following facts are not disputed, unless otherwise indicated.

On July 8, 1997, Perry submitted an application to the Vermont DMV for vanity plates for her motor vehicle, which she co-owned with her husband, Lawrence Perry. Vanity plates are license plates bearing a combination of letters and/or numbers chosen by the vehicle owner rather than chosen randomly by the DMV. In Vermont a vehicle owner may obtain vanity plates by paying an additional fee as long as the requested combination of letters and/or numbers meets certain criteria, including that the requested plate not be "offensive or confusing to the general public." Vt. Stat. Ann. tit. 23, § 304(d).[1]

Here, Perry requested vanity plates bearing the letters "SHTHPNS," which stand for "Shit Happens."[2] The special-

---

**1.** Section 304 governs automobile registration and license plates. Section 304(d), in effect since 1977, states in relevant part: "The commissioner may refuse to honor any request [for a vanity plate] that might be offensive or confusing to the general public." Vt. Stat. Ann. tit. 23, § 304(d) (2000). In 1997 the Vermont legislature added the following clarification effective November 11, 1998: "The commissioner may revoke any special plate that is found to be offensive or confusing to the general public." *Id.* See also Vt. Stat. Ann. tit. 23, § 308(6), *post* note 3, which governs suspension and revocation of registration.

**2.** We are informed that Perry's inspiration in choosing this message was an asserted Alcoholics Anonymous slogan, "Shit happens (so don't let life's problems drive you to drink)." Appellant's Brief on Appeal at 18. Although Perry's brief on appeal, and her counsel at oral argument, note that "SHTHPNS" may also be read as "Shout Happiness," Perry's own complaint in this lawsuit states that the letters at issue stand for "Shit Happens." Complaint ¶ 22.

license-plate application listed "Lawrence & Paula Perry" as co-owners of the vehicle and gave their mailing address as "HCR 32, Box 500, Montpelier, VT 05602," but it was signed only by Paula Perry. She paid a twenty-dollar additional fee for the plates, and the DMV issued the plates on July 10, 1997.

The DMV officials explained to the District Court and in their brief on appeal that the plates were issued in error. The DMV considered Perry's plates to be offensive and accordingly asserted that it could have, and should have, refused to issue them pursuant to VT. STAT. ANN. tit. 23, § 304(d). As noted above, this provision of the Vermont statutes empowers the Commissioner of the DMV to "refuse to honor any request [for special plates] that might be offensive or confusing to the general public." DMV officials first became concerned that Perry's plates were "offensive" and had been issued in error when a DMV employee saw the plates and informed defendant Smith. The DMV then took steps to recall the plates and to replace them at no extra charge.

Pursuant to the DMV's policy of mailing correspondence to the first co-owner listed on the vehicle registration, Smith sent a letter dated August 8, 1997 (the "August letter") to Lawrence Perry at the address listed on the special-plate application. By this time, Perry and her husband were estranged, and Perry had obtained a new mailing address, of which she had not informed the DMV. As a result, Perry did not see the August letter or the DMV letters that followed it until the first week of November 1997.

The August letter explained that the SHTHPNS vanity plates had been issued in error and requested that the addressee, Lawrence Perry, return them to the DMV. Enclosed with the letter were a set of temporary plates to replace the vanity plates, an application for a new set of plates to be issued at no charge, and a postage-paid envelope in which to return the vanity plates. The letter apologized for any inconvenience and invited Lawrence Perry to contact the DMV if he had any questions. The DMV received no response.

Smith then sent a second letter, dated September 22, 1997 (the "September letter"), to Lawrence Perry at the same address. Smith attached a copy of the August letter, stated that the plates had not yet been received by the DMV, and explained that "action to suspend this registration [would] be initiated" if the DMV did not receive, by October 1, 1997, either the plates or a letter indicating that the plates had been destroyed. The DMV received no response to the September letter.

On November 3, 1997, the DMV mailed an "Order of Suspension and/or Revocation of Registration" ("Order") to Lawrence Perry at the same listed address. The Order stated that the registration number SHTHPNS had been "suspended and/or revoked" as of November 3, 1997, and informed the recipient of the right to a hearing on the matter if such a hearing was requested within ten days. By this time, the temporary plates that had been sent with the August letter had expired.

By November 5, 1997, Perry had seen all of the letters, and on that day she mailed to the DMV a response to the Order (the "November 5 letter"), in which she gave her address as "HCR 32, Box 790, Montpelier, VT 05602," an address with a different box number from the one that she had shared with Lawrence Perry. In this November 5 letter, Perry requested a hearing on the revocation of her vanity plates and requested that the plates be reinstated pending the outcome of the hearing, but she did not request a new set

of temporary plates. Perry wrote, *inter alia:* "I don't understand why I was not notified of this complaint against my vanity plate since this registration is not only in Lawrence Perry's name but also mine, Paula S. Perry. None of the correspondence received on this issue has ever been sent to me, the operator of this vehicle." However, the DMV maintains—and Perry does not deny—that Perry had not notified the DMV of her new address until she wrote the November 5 letter.

Smith responded to Perry's November 5 letter with a letter dated November 7, 1997, which described the previous correspondence sent by the DMV and enclosed copies. He explained to Perry that the DMV's files showed the same address for the owner and co-owner of the vehicle and that no address change information for Paula Perry had been received by the DMV. The November 7 letter included a change of address form. It also stated that Perry's request for a hearing had been forwarded to the Hearings Division, and that Perry would be notified of the outcome of the request. It concluded by stating "that the license plate 'SHTHPNS' remains under suspension until the decision is received from the Hearings Division." In his November 7 letter, Smith did not explain that Perry could still obtain temporary plates, or apply for either new vanity plates or a new set of regular plates at no extra charge.

The hearing on the registration revocation was held on November 26, 1997. On January 26, 1998, while the hearing officer's decision was still pending, Perry's

attorney called the DMV to inquire about the status of Perry's registration. Realizing at that point that Perry did not have valid plates since the revocation of her vanity plates had become effective on November 3, 1997, Commissioner McDonald issued a new set of permanent plates and had them hand-delivered to Perry's home that day. The DMV claims that Perry could have accepted these plates without relinquishing her right to appeal the DMV's proposed revocation of the SHTHPNS plate; it is not clear, however, whether anyone explained this to Perry, and Perry has consistently maintained that accepting these plates would have meant giving up her appeal. In any case, Perry refused the new plates.

Several days later, on January 30, 1998, the Commissioner reinstated the SHTHPNS plates pending the hearing officer's decision, so that Perry would not have to continue driving her vehicle with invalid plates. On May 5, 1998, the hearing officer ruled that the revocation had been improper because, at the time of the purported revocation (November 3, 1997), the governing statute, Vt. Stat. Ann. tit. 23, § 308, did not provide for the *revocation* of a vanity plate issued in error.[3] As a result, Perry's plates remain on her vehicle to this day.

After the hearing officer handed down his decision, on January 19, 1999 Perry filed this lawsuit against the DMV in the District Court, seeking a declaratory judgment setting forth her rights, a permanent injunction against defendants prohibiting them from taking similar action against

---

**3.** Section 308 of the Vermont Statutes governs the suspension and revocation of an automobile's registration. Effective July 1, 1998, the statute was amended to state explicitly that the DMV Commissioner had authority to suspend or revoke erroneously issued plates. *See* Vt. Stat. Ann. tit. 23, § 308(6)

("The commissioner may suspend or revoke the registration of any motor vehicle, registered in this state, and repossess the number plates assigned to it, when he or she is satisfied that ... [t]he number plates were erroneously issued.").

her in the future, and damages for the period in which her SHTHPNS plates were revoked, including "hardship . . . in getting to work, procuring food . . . and doing activities outside of the home." On June 21, 2000, the District Court entered judgment for the defendants on the parties' cross-motions for summary judgment, and Perry filed this timely appeal.

## II.

■ We review *de novo* a district court's grant of summary judgment, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor. *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Bowman v. Allstate Ins. Co.,* 238 F.3d 468, 470 (2d Cir.2001). We will affirm a district court's grant of summary judgment if we conclude, after reviewing the record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Bowman,* 238 F.3d at 470. The instant case requires us to review two sets of claims: Perry's claim that the First Amendment protects her right to have vanity plates bearing the letters SHTHPNS, and Perry's claim that the Vermont DMV denied her the due process of law guaranteed by the Fourteenth Amendment when it revoked her vanity plates.

## A.

■ It is well established that "the government need not permit all forms of speech on property that it owns and controls," *International Soc'y for Krishna Consciousness v. Lee,* 505 U.S. 672, 678,

112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). In evaluating government regulations concerning private individuals' speech on government-owned property, the Supreme Court has identified three categories of forums—the traditional public forum, the designated public forum, and the nonpublic forum—and has developed a body of law styled "forum analysis." *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Perry Educ. Ass'n v. Perry Local Educ. Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

■ A traditional public forum is property, such as a public street or a park, that "by long tradition or by government fiat . . . ha[s] been devoted to assembly and debate." *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. 948; *General Media Communications, Inc. v. Cohen,* 131 F.3d 273, 278 (2d Cir.1997). Government restrictions on speech in a traditional public forum are subject to strict scrutiny and must be "necessary to serve a compelling state interest [and] narrowly drawn to achieve that interest." *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439. A designated public forum is created by purposeful governmental action—that is, when the government "intentionally open[s] a nontraditional forum for public discourse." *Id.* at 802, 105 S.Ct. 3439. Restrictions on speech in a designated public forum are also subject to strict scrutiny.[4] *See General Media,* 131 F.3d at 278. Other government properties are nonpublic forums. *See Krishna Consciousness,* 505 U.S. at 678–79, 112 S.Ct. 2701. The government may impose restrictions on speech in a nonpublic forum as long as these restrictions are reasonable and viewpoint-neutral. *See Perry Educ.*

---

4. The Supreme Court has also recognized a sub-category of the designated public forum, called the "limited public forum," the use of which "is limited to particular purposes or

speakers." *General Media,* 131 F.3d at 278 n. 6. Government restrictions on speech in a limited public forum need only be reasonable and viewpoint-neutral. *See id.*

*Ass'n,* 460 U.S. at 46, 103 S.Ct. 948; *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439.

It is undisputed that Vermont's vanity plates are not a traditional public forum. Perry argues that they are a designated public forum, and that we must therefore subject the DMV's restriction on offensive scatological terms to strict scrutiny. Defendants argue, in turn, that Vermont's vanity plates are a nonpublic forum, and that the DMV's restrictions on expressive activity on such plates need only be reasonable and viewpoint-neutral.

### 1. *Forum Analysis*

 In order to determine whether a particular species of government property is a designated public forum, we examine factors such as "the policy and practice of the government" and "the nature of the property and its compatibility with expressive activity." *Id.; see also General Media,* 131 F.3d at 279; *Paulsen v. County of Nassau,* 925 F.2d 65, 69 (2d Cir.1991). The focus of this analysis is the government's *intent;* accordingly, a court must "ascertain whether [the government] intended to designate a place not traditionally open to assembly and debate as a public forum." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. In conducting this analysis, we bear in mind that the government creates a public forum by designating "a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Id.* The government "does *not* create a public forum by inaction or *by permitting limited discourse,* but only by intentionally opening a nontraditional forum for public discourse." *Id.* (emphasis added).

After reviewing Vermont's policies and practices regarding vanity plates and considering the nature of such plates and their "compatibility with expressive activi-

ty," *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439, we conclude that the District Court correctly determined that Vermont did not intend to designate a public forum when it established a vanity plate regime.

First, Vermont's stated policy in issuing license plates, including vanity plates, is to aid in vehicle identification. *See* VT. STAT. ANN. tit. 23, § 304(b)(2)(C) ("[T]he primary purpose of motor vehicle plates is vehicle identification."). Although a policy of vehicle identification is not necessarily inconsistent with a government's intention to designate a public forum, the statement of such a legislative policy does not suggest, much less show, an intention to create a public forum.

Second, as noted by counsel for the state at oral argument, Vermont's vanity plates serve the purpose of raising revenue. Nothing about the revenue-raising aim of the vanity-plate regime suggests that Vermont intended to "create a forum for unlimited public expression." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,* 196 F.3d 958, 966 (9th Cir.1999) (holding that a public school did not create a public forum by allowing commercial advertising on a baseball field fence); *see New York Magazine v. Metropolitan Transp. Auth.,* 136 F.3d 123, 130 (2d Cir.1998).

Third, expressive activity on Vermont's vanity plates is subject to numerous restrictions, including limitations on the number of letters that may appear on a vanity plate and on how many numbers may be used in combination with letters. Furthermore, VT. STAT. ANN. tit. 23, § 304(d) permits the Commissioner to "refuse to honor any request" for a special plate deemed "offensive or confusing to the general public." At the time of Perry's application, the DMV exercised its authority to prohibit offensive vanity plates in part through an unwritten policy of denying requests for plates bearing sca-

tological terms.[5] Such extensive government regulation of expressive activity does not suggest an intent to designate a public forum. *See Cornelius*, 473 U.S. at 804–05, 105 S.Ct. 3439 (holding that a charity drive aimed at employees in the federal workplace was a nonpublic forum because, *inter alia*, the literature each could distribute was limited to a 30 word statement).

■ Fourth, the general public does not have unimpeded access to Vermont license plates, including vanity plates. Rather, only Vermont vehicle owners who have *obtained permission* to do so may place a message of their choice on their vanity plate. Such limited access provides a further indication that the government did not intend to designate a public forum on Vermont's vanity plates.[6] *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 669, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (explaining that government property remains a nonpublic forum "when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, *obtain permission* to use it" (internal quotation marks omitted, emphasis added) (quoting *Cornelius*, 473 U.S. at 804, 105 S.Ct. 3439)); *Perry Educ. Ass'n*, 460 U.S. at 47, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (ex-

plaining that an internal school mail system had not been opened for "indiscriminate use by the general public"—and therefore was not a public forum—where permission had to be sought from principal before using it).

Finally, when we examine "the nature of the property and its compatibility with expressive activity to discern the government's intent," *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439, we reach the obvious conclusion that vanity plates are an unlikely means by which to engage in meaningful "assembly and debate," *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. 948, or other expressive activity. Because vanity plates are physically restricted by size and shape and by the state's interests, including that of vehicle identification, vanity plates are a highly limited and extremely constrained means of expression. The very character of license plates also suggests that they are not a designated public forum.

In light of all of the circumstances described above, we hold that Vermont has not intended to designate, and has not designated, its vanity plates as a public forum. *Cf. In re Denial of the Application for the Custom Plates*, 170 Or.App. 542, 13 P.3d 531 (2000) (en banc) (holding that a vanity plate is not a public forum). *But*

---

**5.** The policy is now spelled out in the new "Special Plates" regulation, which provides that certain combinations of letters will not be ·issued, including, *inter alia*, a "[c]ombination of letters[ ] or numbers with any connotation, in any language, that is vulgar, derogatory, profane, scatological, or obscene." Vt.Code R. 14–050–025 I.(f)(1). *See post* note 9.

**6.** Perry counters that the fact that one must own or lease a motor vehicle in order to apply for a vanity plate does not defeat her argument that a vanity plate is a public forum. While it may be true that a public forum need not be available to everyone in the general public in order to be so designated, *see, e.g., Widmar v. Vincent*, 454 U.S. 263, 267–68, 102

S.Ct. 269, 70 L.Ed.2d 440 (1981) (holding that a university creates a public forum when it makes its facilities generally available to registered student groups), Perry's argument misses the essential point. Those seeking vanity plates must have governmental permission before expressing themselves. *See Perry Educ. Ass'n*, 460 U.S. at 47, 103 S.Ct. 948 (holding that a school's internal mail system was not a public forum because users needed a principal's permission for access). Because Vermont vehicle owners must obtain permission in order to use vanity plates, the state's vanity-plate regime resembles the internal mail system in *Perry* more than it does the college facilities in *Widmar*.

*see Sons of Confederate Veterans, Inc. v. Holcomb,* 129 F.Supp.2d 941, 948 (W.D.Va. 2001) (holding that a vanity plate is a "designated public forum" where a state "allow[s] groups to place various slogans and designs on license plates"). Accordingly, we agree with defendants that a Vermont vanity plate is a nonpublic forum.

Having concluded that a Vermont vanity plate is a nonpublic forum, we must now consider whether the DMV's policy of prohibiting vanity plates with offensive scatological terms passes constitutional muster.

2. *Reasonableness and Viewpoint Neutrality*

■ As noted above, we will uphold a governmental restriction on speech in a nonpublic forum as long as the restriction is reasonable and viewpoint-neutral. *See Perry Educ. Ass'n,* 460 U.S. at 46, 103 S.Ct. 948; *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439.

■ (a) *Reasonableness.* A governmental restriction on speech in a nonpublic forum "need only be reasonable in light of the purpose of the forum ... and reflect a legitimate government concern." *General Media,* 131 F.3d at 282. Vermont asserts that it has two interests at stake in the restriction on offensive scatological terms: (1) protecting the public, especially young children, from offensive and indecent speech; and (2) not associating the State with such speech. Perry argues, however, that the restriction is unreasonable because her vanity plates do not "actually interfere" with vehicle identification, the DMV's stated purpose in issuing license plates.

We are not persuaded. As the District Court correctly concluded, Vermont's restriction on scatological terms—what the Vermont statute describes as "offensive"— reasonably serves legitimate governmental interests. Automobile license plates are governmental property intended primarily to serve a governmental purpose, and inevitably they will be associated with the state that issues them. Although the owner of a vehicle chooses the characters that appear on a vanity plate, the Vermont DMV must approve of a vanity plate before issuing it. The state has a legitimate interest in not communicating the message that it approves of the public display of offensive scatological terms on state license plates. *See General Media,* 131 F.3d at 283–284 (holding that the government has a legitimate interest in not appearing to endorse "lascivious" materials on a military base, and that banning such materials is a reasonable way to serve that interest).

■ The fact that Perry's plates do not actually interfere with vehicle identification, Vermont's stated purpose in issuing license plates, does not end the inquiry. Whether or not vehicle identification is hampered is merely one factor in a broader inquiry that includes consideration of whether the restriction serves legitimate governmental interests. *See Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. If a restriction on speech in a nonpublic forum serves a legitimate governmental interest—and in this case, it does—then the fact that the prohibited expression does not "interfere" with a *principal* purpose of the forum does not render that prohibition unconstitutional. Otherwise, no governmental restriction on speech on any Vermont license plate would be permissible as long as each plate was somehow unique, because each plate would further Vermont's interest in vehicle identification.

Moreover, Vermont's policy does not prevent Perry from communicating any particular message on her automobile. For instance, Perry may display a bumper sticker bearing the letters SHTHPNS if she so desires. Vermont's scatological

terms policy is thus reasonably "directed not to suppressing, but to disassociating the [state] from, plaintiff's speech." *General Media,* 131 F.3d at 281 n. 10. Accordingly, Vermont's restrictions on offensive scatalogical vanity plates are reasonable.

 (b) *Viewpoint-neutrality.* We have explained that the government may reasonably restrict expressive activity in a nonpublic forum on the basis of content, but not on the basis of the speaker's viewpoint. *See Longo v. United States Postal Serv.,* 983 F.2d 9, 12 (2d Cir.1992). For instance, a state might be permitted to prohibit speech on scatalogical subjects, but it may not be able to prohibit the expression of particular views about such subjects. *See Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

It is apparent that Vermont's policy does not oppose Perry's philosophical views as reflected in the vanity plate. Vermont's policy prohibits Perry's vanity plate not because it stands for "Shit happens (so don't let life's problems drive you to drink)," but because Perry chose to express that viewpoint using a combination of letters that stands in part for the word "shit." This restriction does not discriminate on the basis of viewpoint.[7]

Perry argues that the DMV did not act neutrally when it attempted to revoke her plates because it has issued several vanity plates bearing scatological terms, including: CASHIT, TRASHIT, SHTRBUG, SHTZER, IRSHITL, DUMPRUN, COWPIES, ECOLI, POOPER, TOOT, BM, MERDE, SHHAD. There are two problems with this argument.

First, as the DMV notes, it has issued 37,000 vanity plates and receives 125 applications per week for such plates, and as a result of the large number of applications it has to process, some plates, like Perry's, are issued in error. That errors have happened in other instances does not mean that Perry is a victim of viewpoint discrimination.

Second, Perry contends that some of the aforementioned vanity plates were *not* issued in error, and that this proves that, in applying its "scatological terms" policy to her SHTHPNS plates, the DMV discriminated against her on the basis of her viewpoint.[8]

We disagree. Even if some of the plates listed above were not issued in error, Perry errs in focusing solely on the "scatological" aspect of the policy and ignoring its "offensiveness" aspect. Section 304(d) concerns *offensive* scatological terms, not just scatological terms. Thus, more than half of the plates Perry identifies (specifically, those that do not use readily recognizable profanities) do not suggest that the DMV discriminated against her choice of letters. Perry argues that the DMV has inconsistently applied its scatological terms policy by issuing plates with scatological terms it considers "cute," and that this distinction does not pass muster as viewpoint-neutral under the First Amendment. But the difference between Perry's plates and most of those listed above is not that the latter are "cute," but that they do not use easily recognizable profanities. The relevant difference between "shit" and

---

7. The question of whether the Vermont restriction discriminates on the basis of content is one we need not, in these circumstances, address.

8. Perry does not argue that any specific plate on this list was issued on purpose; instead, she merely assumes that some of them *must* have been issued on purpose. As we explain below, even if this assumption is correct, it does not affect our conclusion.

"pooper," for instance, is not the so-called "cuteness" of the word "pooper," but the fact that "shit" is a profanity. That is why the DMV considers the latter · offensive.

### 3. *Prior restraint*

■ Perry makes the additional argument that the DMV's actions imposed an impermissible "prior restraint" on her speech by denying the application for vanity plates before providing her notice and a hearing and by placing the burden on Perry to prove that the denial was improper.

■ A prior restraint is a governmental order or action "forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993) (quoting MELVILLE B. NIMMER, NIMMER ON FREEDOM OF SPEECH § 4.03, at 4–14 (1984)). In addition, a system of licensing that requires parties to obtain permits from the state before engaging in expression can be an unconstitutional prior restraint when state officials are allowed to exercise "unfettered discretion" in the absence of explicit standards or procedures. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Prior restraints on expression in a public forum have generally been subjected to exacting scrutiny. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 226, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (plurality opinion) (collecting cases).

■ However, "the context in which [a prior restraint] occurs can affect the level of scrutiny applied." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir.1999). Prior restraints in a nonpublic forum have been upheld as long as they were reasonable and viewpoint-neutral. *See Cornelius*, 473 U.S. at 813, 105 S.Ct. 3439 (holding that a federal charity drive, a nonpublic forum, could limit participation to a number of select charities as long as the restriction was reasonable and viewpoint-neutral); *Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1540 (7th Cir.1996) (holding that school officials could prevent a student from distributing invitations in a public elementary school, a nonpublic forum, because the restraint was reasonable). A nonpublic forum by definition is characterized by "selective access," *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998), which necessarily means that the state can select or limit who may speak and what may be said *prior to its expression* as long as the restrictions meet the requirements of reasonableness and viewpoint-neutrality. Accordingly, a restriction on expression which would otherwise be deemed a prior restraint if it had been applied in a public forum is valid in a *nonpublic* forum as long as it is reasonable and viewpoint-neutral. *See id.* (holding that a state-sponsored televised election debate was a nonpublic forum, and state officials could exercise broad editorial discretion in deciding which candidates to invite as long as the decisions were reasonable and viewpoint-neutral); *Hazelwood v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (concluding that a high school newspaper was a nonpublic forum and that prepublication control by school officials was reasonable); *Greer v. Spock*, 424 U.S. 828, 840, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (concluding that a military base was a nonpublic forum, and that military officials could require prior approval before allowing the distribution of political campaign literature, and noting that restrictions had not been applied "irrationally").

In the instant case, Perry seeks damages, a declaratory judgment, and injunc-

tive relief. With respect to her claim for damages, which is an "as-applied" challenge, *cf. Eide v. Sarasota County*, 908 F.2d 716, 722 (11th Cir.1990) ("In the case of an as applied challenge, the remedy is ... damages resulting from the unconstitutional application"), Perry's prior restraint argument fails. When Vermont originally recalled Perry's plates pursuant to Vt. Stat. Ann. tit. 23, § 304(d), *see* note 1 *ante*, it did not prevent Perry's expression in advance of its display. In fact, Perry received her vanity plates and was able to display them until the DMV instituted revocation proceedings. Accordingly, on these facts, there was no prior restraint of Perry's expression.

With respect to her declaratory judgment claim and her claim for injunctive relief against a future revocation, we examine Vermont's current vanity-plate regime and conclude that it is not an unconstitutional prior restraint on First Amendment expression for two reasons. First, Vermont's vanity plates are a nonpublic forum and access is, by definition, selective. Second, as discussed in subsections II.A.2(a) and (b), *ante*, Vermont's

restrictions are reasonable and viewpoint-neutral. Vermont's vanity-plate regime is governed by Vt. Ann. Stat. tit. 23, § 304(d) and by the state regulation implementing that provision—that is, vanity plates are issued subject to the granting of permission by an authorized state official. While § 304(d) grants the state the power to revoke "offensive" or "confusing" vanity plates, the regulation limits this discretion by specifying content [9] and includes the right to a prerevocation hearing.[10] *Cf. Lewis v. Wilson*, 253 F.3d 1077 (8th Cir.2001) (holding that a state statute authorizing the rejection of vanity plates deemed "contrary to public policy" violated the First Amendment because it granted "unfettered discretion" to state officials).

Because we have concluded that the vanity-plate regime is a nonpublic forum and that the rules governing it are reasonable and viewpoint-neutral, we do not find the regime to be an unconstitutional prior restraint.

\* \* \* \* \* \*

In sum, we hold that the DMV's policy of refusing to grant applications for vanity

---

9. Vt.Code R. 14–050–025 I.(f) provides, in relevant part, that vanity plates containing the following are prohibited:

(1) Combination of letters, or numbers with any connotation, in any language, that is vulgar, derogatory, profane, scatological or obscene;

(2) Combinations of letters, or numbers that connote, in any language breast, genitalia, pubic area, or buttocks or relate to sexual or eliminatory functions. Additionally, "69" formats are prohibited unless used in combination with the vehicle make....

(3) Combinations of letters, or numbers that connote, in any language: (i) any illicit drug, narcotic, intoxicant, or related paraphernalia; (ii) the sale, user, or purveyor of such a substance; or (iii) the physiological state produced by such a substance;

(4) Combination of letters, or numbers that refer, in any language, to a race, religion,

color, deity, ethnic heritage, gender, sexual orientation, disability status, or political affiliation;

(5) Combinations of letters, or numbers that suggest, in any language, a government or governmental agency;

(6) Combinations of letters or numbers that suggest, in any language, a privilege not given by law in this state;

(7) Combinations of letters or numbers that form, in any language, a slang term, abbreviation, phonetic spelling or mirror image of a word described in (1) through (6)

10. Vt.Code R. 14–050–025 I.(g) provides, in relevant part: "[N]otice shall be made in the same manner as license or registration suspensions or revocations ... and shall include the right to a prerevocation hearing."

plates bearing scatological terms that may be deemed offensive by the general public reasonably serves a legitimate government interest and does not discriminate on the basis of viewpoint. Accordingly, neither the policy nor its application to Perry violates the First Amendment.

### B.

■■■ We turn now to Perry's due process claim. Perry claims that due process requires notice and a hearing before revocation of her vanity plates. We observe at the outset that Perry was given notice that her vanity plates were to be revoked [11] and was afforded a *post* revocation hearing (at which she prevailed). To this day, she continues to drive with her SHTHPNS plates. Perry claims, however, that she deserves damages because of the three months' inconvenience she suffered when she was allegedly deprived of the use of her vehicle pending the outcome of the hearing. She also seeks to set forth her rights in a declaratory judgment because the DMV intends to reinstitute revocation proceedings against her.

We note that the DMV had attempted to contact her to give her temporary plates so that she could drive pending the result of the hearing. In fact, the DMV even *reinstated* Perry's SHTHPNS plates pending the result of the hearing because Perry insisted, contrary to the view of the DMV, that she would have waived her right to appeal had she accepted the DMV's temporary plates. In addition, Vermont has amended its policy and now provides for a *prerevocation* hearing.[12] VT.CODE R. 14–050–025 I.(g) (2001). We conclude that Perry's retrospective due process claim— the claim that she was deprived of asserted due process rights to notice and to a prerevocation hearing—is without merit, and therefore hold that Perry's claim for prospective relief through a declaration of rights in the future must fail.

■■■ In evaluating due process claims, "[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Narumanchi v. Board of Trs. of the Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir.1988); see *Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). As we have explained, *"[i]f a protected interest is identified, a court must then consider whether the government deprived the plaintiff of that interest without due process." Narumanchi*, 850 F.2d at 72 (emphasis in original).

■■■ Here, even if we assume for the argument that Perry has a "protected in-

---

**11.** The DMV first attempted to contact Perry at the address she herself provided. In addition, the November 3 letter of suspension was governed by VT. STAT ANN. tit. 23, § 204(a), which provides:

(a) A person whose license to operate a motor vehicle, nondriver identification card or whose motor vehicle registration has been issued in error or is suspended or revoked by the commissioner under the provisions of this title shall surrender forthwith his or her license or registration upon demand of the commissioner or his or her authorized inspector or agent. The demand shall be made in person or by notice in writing sent by first

class mail to the last known address of the person, and the suspension shall be deemed to be in effect upon the making of the demand, if made in person, or three days after the deposit of the notice in the United States mails, if made in writing.

**12.** VT. STAT. ANN. tit.23, § 204(c), provides:

(c) If a presuspension or prerevocation hearing is available by law, the written notice of suspension or revocation shall so state. Unless otherwise specifically provided by statute, a written request for a hearing must be received at the department of motor vehicles within 15 days after the date of the notice or the right to a hearing is deemed to be waived.

terest" in driving her vehicle with vanity plates bearing the letters SHTHPNS pending the outcome of her revocation hearing, the requirements of due process were fully satisfied by the state's notice and hearing procedures provided to Perry. "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Joint Anti–Fascist Comm. v. McGrath,* 341 U.S. 123, 171–172, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)). The precise form of notice and hearing depends upon balancing (1) the state's interest; (2) the private interest affected by the state's action; and (3) the risk of erroneous deprivation and the value of additional safeguards. *Id.* at 335, 96 S.Ct. 893.

As to the first *Mathews v. Eldridge* factor, the state's interest here is significant. Vermont has a legitimate interest in not having "offensive" scatalogical language on its license plates for all to see. It is also appropriately concerned with safeguarding its reputation and disassociating itself from offensive language. *Cf. General Media,* 131 F.3d at 283–284 (concluding that prohibiting sale of sexually explicit materials on military base is a legitimate governmental concern).

■ As to the second factor, Perry's articulated interest is, in our view, minimal: While "*a driver's license* is a property interest that may not be suspended or revoked without due process," *Plumer v. Maryland,* 915 F.2d 927, 931 (4th Cir.1990) (emphasis added) (citing *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971)), what is at stake here is not Perry's interest in driving, but merely her interest

in driving a vehicle that displays a preferred set of vanity plates.[13] Whether, in this particular case, this interest is substantial enough to be regarded as a "protected interest" under the Due Process Clause—a question which we need not answer—the interest does not appear to be as significant as, for example, the loss of income or public-assistance benefits. *See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Accordingly, Perry's interest does not weigh heavily in the *Mathews v. Eldridge* balancing test, and certainly it weighs less heavily than the state's interest.

As to the final relevant factor under *Mathews v. Eldridge,* there is little risk of an erroneous deprivation of an individual's asserted interest in having preferred vanity plates if she does not receive a hearing *before* the plates are revoked. It will ordinarily be apparent on the face of a vanity plate whether it is "offensive ... to the general public." VT. STAT. ANN. tit. 23, § 304(d). Accordingly, it is only the rare case—in which there is room for genuine factual dispute as to the sensibilities of the "general public"—in which a pre-revocation hearing will reduce the risk of an erroneous deprivation of particular vanity plates.

In short, applying the *Mathews v. Eldridge* balancing test to the circumstances presented here, we conclude that the Due Process Clause did not vest Perry with a right to a hearing before her vanity plates were revoked. *Cf., e.g., Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (holding a driver's license may be summarily suspended before any hearing has been provided where official records show that a particular driver has an ex-

---

**13.** As noted, Perry had the option of continuing to drive with temporary plates, and she was notified of this option. Had she exercised this option, Perry would not have waived her right to challenge the revocation of her vanity plates.

traordinarily poor driving record); *Sutton v. City of Milwaukee,* 672 F.2d 644 (7th Cir.1982) (holding that towing of illegally parked vehicles without opportunity for prior hearing did not violate due process); *Sabree v. Parking Violations Bureau, City of Rochester,* 135 Misc.2d 514, 516 N.Y.S.2d 155 (Monroe County Ct.1987) (same).

In sum, the only interest affected by the DMV's actions was Perry's interest in using her vanity plates pending the outcome of her appeal. The notice and postrevocation hearing provided by the state was adequate under the circumstances. Accordingly, Perry's due process rights were not violated when the state revoked her plates pending the outcome of the hearing,[14] and her claim for damages was correctly denied. Additionally, the DMV's current policy of providing a *pre* revocation hearing is clearly sufficient to meet the requirements of due process, rendering meritless Perry's declaratory judgment claim.

### III.

We conclude that

(1) Vermont's license plates are a nonpublic forum for purposes of the First Amendment;

(2) Vermont's prohibition on the use of automobile license plates bearing scatological terms that might be deemed offensive or confusing by the general public is reasonable and viewpoint-neutral;

(3) Vermont's actions in revoking Perry's vanity plates did not constitute a prior restraint on speech, and Vermont's current vanity-plate regime is not an unconstitutional prior restraint on speech because its restrictions and procedures are reasonable and viewpoint-neutral;

(4) Vermont's revocation of Perry's vanity plates prior to a hearing and Vermont's current revocation procedures do not infringe Perry's constitutional right to due process of law.

Accordingly, the judgment of the District Court is affirmed.

14. We find unpersuasive Perry's claims concerning deficient notice and observe that the DMV attempted to contact her several times at the address that she had provided. The District Court also correctly observed that "[a]ny inconvenience she suffered was a result of her own failure to exchange the license plates erroneously issued to her, not [ ] a result of the state's refusal to issue her new plates."