NIEMEYER, Circuit Judge,
dissenting from the denial of rehearing en banc.
This case presents the important First Amendment issue of whether a State may *248 regulate and control the content included on state-issued and state-owned license plates. Whether license-plate content is government speech has never been decided by our court, and the appropriate analysis is not clearly indicated by any Supreme Court precedent. Moreover, the two other circuits that have reviewed license plate speech have taken different analytical courses. Compare Perry v. McDonald, 280 F.3d 159 (2d Cir.2001) (holding that State owned license plate is a nonpublic forum entitling the State to deny a license plate with “SHTHPNS” (referring to “Shit Happens”) on it as a reasonable and viewpoint-neutral regulation), with Lewis v. Wilson, 253 F.3d 1077 (8th Cir.2001) (concluding that whether the forum is nonpublic or public is irrelevant because the State, in rejecting “ARYAN 1,” operated under an unconstitutionally overbroad regulation that violated the First Amendment). Coupled with the virtually even split within our court (6-5) to deny rehearing en banc it appears clear that this case presents an unsettled issue of First Amendment law that should have been heard en banc.
The specific question presented is whether the Commonwealth of Virginia can refuse to include a Confederate Flag logo on the face of a special license plate, authorized for issuance to members of the Sons of Confederate Veterans. Virginia authorized the issuance of the special license plates commemorating that organization but denied the organization’s request to include the Confederate Flag logo as part of the plate’s design. The Confederate Flag, while appreciated by an organization commemorating the bravery of Civil War veterans as a symbol of honor, is at the same time a racially hostile symbol to a large segment of Virginia’s citizens insofar as the Civil War included a fight to preserve slavery. Nevertheless, the district court concluded that Virginia’s denial of the Sons of Confederate Veterans’ request to include the Confederate Flag logo was a restriction on speech that violated the First Amendment and accordingly struck down that portion of Virginia’s law, essentially mandating that Virginia include the logo on the special plates. Because this issue is important not only to Virginia but also to the right of all States to regulate the issuance and content of their license plates, I submit it is worthy of our en banc review.
No one takes issue with the fact that Virginia has an important right and responsibility to regulate motor vehicles and that essential to this regulatory effort is the issuance of license plates evidencing the registration of the vehicle and its compliance with safety and insurance requirements. See generally Va.Code Ann. §§ 46.2-701; -707; -708; -709; -712. Because license plates serve an essential function for the public health, safety, and welfare, Virginia retains an inherent and important right to control the plates and their content.
In order to retain control over this regulatory scheme, Virginia manufactures its license plates, issues them to licensees in accordance with strict regulations and requirements for their display, and reserves the continuous right to revoke or recall them. See id. §§ 46.2-709; -712; -713; - 715; -716. Furthermore, Virginia expressly retains title to all State-issued license plates, asserting that they may be repossessed by the Department of Motor Vehicles at any time as provided by statute. Id. §§ 46.2-713; -709. And consistent with this control, Virginia directs that no person may alter the content of a license plate issued by the State or display a license plate that has been altered. See id. § 46.2-722.
*249 In addition to the role license plates serve in protecting public health, safety, and welfare, the issuance of license plates produces revenue that is used to pay for the administration of automobile registration and to support the uninsured motorist fund. See id. § 46.2-710. To increase those revenues (and to honor certain organizations), the State permits the Department of Motor Vehicles to issue customized license plates and special license plates identifying specific groups, if such plates are authorized by the legislature. See id. §§ 46.2-725; -726.
One of the special plates authorized by the Virginia legislature is for members of the Sons of Confederate Veterans. Id. § 46.2-746.22. The authorizing statute provides:
On receipt of an application therefor and written evidence that the applicant is a member of the Sons of Confederate Veterans, the Commissioner shall issue special license plates to members of the Sons of Confederate Veterans. No logo or emblem of any description shall be displayed or incorporated into the design of license plates issued under this section.
Id. The text of this provision thus authorizes a special license plate honoring the Sons of Confederate Veterans, but indicates that the plate may not display the Confederate Flag logo, or any other logo for that matter.
The State may rationally have concluded that, despite the perception of the Confederate Flag by some as an emblem of honor, to issue a license plate with the Confederate Flag logo on it would distress African Americans and many others in the State. The State, however, has not taken a position on this controversial symbol; rather, it has removed itself from the fray, simply refusing to authorize the Confederate Flag logo on license plates issued by it. In doing so, of course, Virginia has not prohibited any citizen from displaying the Confederate Flag logo on his or her vehicle. Rather, the State has only indicated that the Confederate Flag logo should not be included on a license plate issued and owned by the state and bearing the name “VIRGINIA” on the top. The State’s decision mirrors a previous case in which Virginia denied an applicant the right to include the phrase “UNION YES” on its license plate.
I respectfully submit that because Virginia owns the license plates it issues and rightfully controls what appears on them, it can, as part of its control, designate their content as its own speech. My position is consistent with the “well settled [principle] that the government need not permit all forms of speech on property that it owns and controls.” International Soc’y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992).
As the panel opinion in this case concedes, “It is well established that ‘the government can speak for itself.’ ” Sons of Confederate Veterans, Inc. v. Comm’r of the Va. Dep’t of Motor Vehicles, 288 F.3d 610, 616 (4th Cir.2002) (quoting Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 229, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000)). And this “authority to ‘speak’ necessarily carries with it the authority to select from among various viewpoints those that the government will express as its own.” Id. at 617 (citing Rust v. Sullivan, 500 U.S. 173, 194, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)). But the panel reached the remarkable conclusion that the content on license plates owned and controlled by the State and bearing the State’s name is not the State’s speech. I respectfully disagree. The State has manifested its complete control over license plates, even dictating modifi *250 cations, alterations, and special language or numbers that it will accept. And with the name “VIRGINIA” at the top of the license plates, any -message conveyed by the plates’ content is easily connected to the State. As such, I would conclude that the content of the license plates is government speech and that the State of Virginia did not run afoul of the First Amendment by rejecting a request from an applicant to authorize a license plate displaying a Confederate Flag logo.
The Supreme Court has recognized that the government may limit speech when the speech is that of the government or when the government uses private speakers to transmit its messages. This issue has been addressed most directly in cases where the Court allowed the government to restrict the speech of private individuals because those individuals were essentially speaking for the government as participants in federally funded programs. See Nat’l Endowment for the Arts v. Finley, 524 U.S. 569, 587-88, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (upholding statutory criteria used to determine what artists were eligible for federal funds distributed by the National Endowment for the Arts and noting that “the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake”); Rust v. Sullivan, 500 U.S. 173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (upholding regulations that prohibited Title IV projects from engaging in abortion counseling, referral, or activities advocation abortion as in method of family planning because “[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way”); see also Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 542, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) (striking down restrictions placed on funding to Legal Services Corporation (“LSC”) that prohibited recipients from engaging in representation involving challenges to the validity of existing welfare laws because “the lawyer [receiving LSC funds] is not the government’s speaker,” and thus “the LSC program was designed to facilitate private speech, not to promote a governmental message”). The Supreme Court has recognized that these cases stand for the general principle that the government is free to control the content of its own speech. See Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (noting that the Court has “permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message”).
By force of this principle, which authorizes the government to regulate even the speech of others who speak on behalf of the government, a State that owns and controls its license plates must be authorized to regulate the content of speech on them. Even though the applicant may request certain configurations of numbers and letters on license plates, the State retains the right to approve the license plates in accordance with its own preferences. At bottom, Virginia’s licensing regulation does not abridge anyone’s speech. Those who wish to display the Confederate Flag logo, even on their motor vehicles, remain free to do so. They are merely deprived of the right to demand that the Commonwealth of Virginia endorse their message by issuing license plates containing that logo.
The only license plate case to reach the Supreme Court seems to embrace the notion that license plates are the State’s speech. See Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (holding that requiring a licensee to dis *251 play the New Hampshire State slogan “Live Free or Die” was compelled speech in violation of the First Amendment). In Wooley, the Court acknowledged, albeit in concluding that license plate matters were compelled speech, that what appeared on license plates was the State’s message, id. at 715, 97 S.Ct. 1428, and that the licensee was being required to act as a “courier for such message,” id. at 717, 97 S.Ct. 1428.
I respectfully submit that it is impossible to avoid the conclusion that the Commonwealth of Virginia, by manufacturing license plates, placing its name at the top of those plates, and retaining ownership of them, is the speaker of any message contained on those plates, even though the message may have been adopted by the State pursuant to an application submitted by a licensee. The fact that the licensee also speaks by choosing to display a customized but authorized version of the license plate does not change the fact that the license plate itself was the issue of the State and therefore constitutes government speech.
Because I believe we miss an important opportunity to air this issue before the entire court and to provide the Supreme Court with a reasoned discussion of the issue, I dissent from our refusal to rehear this case en banc.
GREGORY, Circuit Judge,
dissenting from the denial of rehearing en banc.
I write, not to suggest that the ultimate result of the panel’s decision would not be reached on full review, but to put forth my view that the panel did not fully and adequately analyze the “government speech” aspect of this case. What is, and what is not, “government speech” is a nebulous concept, to say the least. Indeed, as the panel recognized, “[n]o clear standard has yet been enunciated in our circuit or by the Supreme Court for determining when the government is ‘speaking’ and thus able to draw viewpoint-based distinctions, and when it is regulating private speech and thus unable to do so.” Sons of Confederate Veterans, Inc. v. Comm’r of the Virginia DMV, 288 F.3d 610, 618 (4th Cir.2002).[1] The panel utilized a four-factor test, borrowed from our sister circuits, which may well be a good starting point in tackling this difficult issue. However, I have two fundamental problems with the panel’s analysis.
First, even assuming the test is the correct and only standard by which we are to decide this issue, the panel’s application of the test is incomplete at best. The opinion, in almost cursory fashion, finds each factor to weigh in favor of private speech. .With these findings, I respectfully disagree.[2] I also believe there is more to be said about the test, including how the factors relate to each other, and the relative weight to be given each factor.
Second, though I recognize the utility of the four-factor test, I submit that the test may not be sufficiently nuanced to resolve *252 the underlying issue here. Whether or not an expressive event has a component attributable to the government is not nearly as black and white as the test would suggest. This case is a difficult one, not simply because it involves the Confederate flag, but because license plate programs like the one implemented here really have elements of both private and government speech.[3]
The opinion, in my view, fails to recognize the blurry and sometimes overlapping line between private and government speech. I would have hoped, if rehearing were granted, that we would consider the government’s interest in avoiding “speech by attribution;” that is, the government’s right not to be compelled to speak by private citizens.[4] “Speech by attribution,” a largely unexplored concept of First Amendment jurisprudence, demonstrates the tricky interplay and relationship between the concepts of private and government speech.
For even if the display of the Confederate flag is not considered “pure” government speech, that there will be a perception of government endorsement of the Confederate flag is undeniable. Though the panel disagrees, the display of the Confederate flag will be attributed to Virginia. In order to avoid any confusion about Virginia’s official position regarding its display, the Confederate flag has essentially been “zoned off’ state-issued license plates. In other words, the state has enacted a time, place, and manner restriction, that is designed to deal with a negative externality of what otherwise may be protected symbolic speech. Renton v. Playtime Theatres, Inc., 475 U.S. 41, 45-49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); see Young v. American Mini Theatres, Inc., 427 U.S. 50, 82 n. 4, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (Powell, J., concurring) (“If [the city] had been concerned with restricting the message purveyed by adult theaters, it would have tried to close them or restrict their number rather than circumscribe their choice as to location.”). The most plausible explanation for the statute is that it was aimed at this problem of “speech by attribution.” Cf. Boy Scouts of America v. Dale, 530 U.S. 640, 655-56, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (recognizing private organization’s interest in not communicating message of individual member that is incompatible with organization’s message). I believe this was the predominate concern that motivated its enactment, not the content of SCV’s message, or their particular viewpoint. Renton, 475 U.S. at 48, 106 S.Ct. 925. Laws of this sort are typically reviewed under the intermediate scrutiny standard. See Los Angeles v. Alameda Books, Inc., — U.S. -, 122 S.Ct. 1728, 1733-34, 152 L.Ed.2d 670 (2002) (plurality opinion); Renton, 475 U.S. at 50, 106 S.Ct. 925.
It is at least arguable, and I think quite likely, that this law would survive intermediate scrutiny. As already stated, the ban on the Confederate flag is designed to serve the substantial government interest of disassociating the Commonwealth from the Confederate flag. And reasonable alternative avenues of communication remain available. The only place the flag cannot be displayed is on the state-owned, state-issued license plate. Moreover, the SCV can still have a license plate, but without the flag. The SCV is therefore able to communicate the message that the *253 license plate provision was originally-meant to enable — that of membership in a particular organization. Thus, the statute is more than reasonable; it is as narrowly tailored as it could possibly be.
The issues presented here are important ones, unresolved by precedent, and, in my view, worthy of en banc review. Five members of this Court have voted for rehearing en banc. This Court should take pause and avail itself of its collective wisdom before striking down a statute of the Commonwealth of Virginia that, in my view, makes a rational attempt to balance government and private interests. This Nation has yet to heal from the deep wounds left by the Civil War. Ghosts from that terrible war and the issues of slavery still haunt America’s public institutions. Somehow we, as Americans, must transcend this divide and find a way to “bind up the Nation’s wounds.” Abraham Lincoln, Second Inaugural Address (March 4, 1865), in The Living Lincoln 640 (Paul M. Angle & Earl S. Miers eds., Barnes & Noble Books 1992). Perhaps the legislature, duly elected by the people of Virginia, got it right. Enacting a statute that allowed members of the SCV to display their heritage in a proud and positive manner, without the Commonwealth of Virginia being perceived as promoting a symbol that has and continues to be the source of so much pain, was truly a step toward healing our Nation. Perhaps it would give many Virginians an opportunity to see the issues in a different light and begin to appreciate the SCV’s celebration of heritage, without seeing “stars” or peering through “bars.”

. I must note that I do not necessarily agree with the panel’s implication in this statement that the government can always engage in viewpoint discrimination when it is the speaker. It may be that "the values underlying viewpoint neutrality should in some circumstances limit the government's ability to skew the debate and suppress disfavored ideas or information.” Marjorie Heins, Viewpoint Discrimination, 24 Hastings Const. L.Q. 99, 159 (1996).

. For example, I am utterly unconvinced that the private citizen bears the "ultimate responsibility” for the speech in this case. The panel gave very short shrift to this factor — the factor I think may very well be a key to the case. The panel opinion simply states, in what amounts to little more than ipse dixit, that the government does not bear the ultimate responsibility for the speech.

. This is particularly true with respect to the Confederate flag, which conveys a historically "governmental'' message.

. The Commonwealth is in a position very similar to that of objecting drivers in Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).