**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARIZONA LIFE COALITION INC., an
Arizona nonprofit corporation;
GARY PAISLEY, an individual,
          *Plaintiffs-Appellants,*

              v.

STACEY STANTON, Arizona License
Plate Commission Chair, in her
personal capacity; MICHAEL FRIAS,
Arizona License Plate Commission
member, in his personal capacity;
BRIAN LANG, Arizona License
Plate Commission member, in his
personal capacity; JOHN SPEARMAN,
Arizona License Plate Commission
member, in his personal capacity;
JACKIE ALLGOOD, Arizona Motor
Vehicle Division legislative
liaison, in her personal capacity;
TERRY CONNOR, individually and in
his capacity as an Arizona License
Plate Commission member;
WILLIAM A. ORDWAY, in his
official capacity as an Arizona
License Plate Commission
member; LELA STEFFEY, in her
official capacity as an Arizona
License Plate Commission
member,
          *Defendants-Appellees.*

No. 05-16971

D.C. No.
CV-03-01691-PGR

OPINION

Appeal from the United States District Court
for the District of Arizona
Paul G. Rosenblatt, District Judge, Presiding

1279

Argued and Submitted
October 15, 2007—San Francisco, California

Filed January 28, 2008

Before: David R. Thompson and Richard C. Tallman,
Circuit Judges, and Kevin Thomas Duffy,*
Senior United States District Judge.

Opinion by Judge Tallman

*The Honorable Kevin Thomas Duffy, Senior United States District
Judge for the Southern District of New York, sitting by designation.

## COUNSEL

Jeffrey A. Shafer (argued), Alliance Defense Fund, Washington, D.C.; Benjamin W. Bull, Alliance Defense Fund, Scottsdale, Arizona; Peter A. Gentala, The Center for Arizona Policy, Scottsdale, Arizona; Gary S. McCaleb, Alliance Defense Fund, Scottsdale, Arizona, for the plaintiffs-appellants.

Daniel P. Schaack (argued), Assistant Attorney General, Phoenix, Arizona; James R. Morrow, Assistant Attorney General, Liability Management Section, Phoenix, Arizona, for the defendants-appellees.

Denise M. Burke, Women's Choice Pregnancy Clinic, Chicago, Illinois, for the amicus curiae.

---

## OPINION

TALLMAN, Circuit Judge:

Arizona Life Coalition ("Life Coalition") appeals a summary judgment in favor of Stacey Stanton and other members of the Arizona License Plate Commission (collectively the "Commission"). Life Coalition contends that the Commission violated its First Amendment right to free speech and Fourteenth Amendment right to equal protection by arbitrarily denying its application for a special Arizona organization license plate that would portray its message "Choose Life." We agree that the Commission violated Life Coalition's First Amendment right to free speech and therefore do not reach its equal protection argument.

Messages conveyed through special organization plates—although possessing some characteristics of government speech—represent primarily private speech. Through its spe-

cial organization license plate program, Arizona has created a limited public forum for all nonprofit organizations that meet the State's statutory requirements. Because the Commission denied Life Coalition's application on grounds not specified in the statute or related to the limited purpose of the license plate forum, we reverse the district court's grant of summary judgment in favor of the Commission.

# I

The parties do not dispute the facts, and there is no material issue of fact to prevent summary judgment from being entered. Life Coalition is an Arizona nonprofit corporation that provides "compassionate care . . . to persons who are considering abortion, or who are affected by abortion." In June 2002, Life Coalition resubmitted an application for a speciality plate that would "display Life Coalition's official logo, a small graphic of two children's faces and the motto, 'Choose Life.[1] The Arizona Department of Transportation ("Department") certified that Life Coalition met the requirements of Arizona Revised Statute section 28-2404(G)(2)[2] and submitted Life Coalition's request for its special license plate to the Commission.[3]

---

[1]Life Coalition had previously submitted an application in January 2002; however, that application was either not received by the Commission or lost.

[2]Arizona Revised Statute section 28-2404(G)(2) defines "organization" as

> an entity that is organized as a nonprofit corporation pursuant to title 10, chapters 24 through 40 and that either: (a) Certifies to the department that the organization has at least two hundred members[; or] (b) If the organization has fewer than two hundred members, agrees to pay the production and program costs of the special organization plate as determined by the commission.

(Footnote omitted).

[3]Arizona Revised Statute section 28-2404(A) provides that if the Department "determines the organization meets the requirements of an organization as defined in [section 28-2404(G)(2)], the [D]epartment shall submit the request for a special organization plate to the license plate commission."

Upon receiving a request, section 28-2404(B) provides that

> [t]he [C]ommission *shall* authorize a special organization plate if the organization meets the following requirements:
>
> > (1) The primary activity or interest of the organization serves the community, contributes to the welfare of others and is not offensive or discriminatory in its purpose, nature, activity or name[;]
> >
> > (2) The name of the organization or any part of the organization's purpose does not promote any specific product or brand name that is provided for sale[;] and
> >
> > (3) The purpose of the organization does not promote a specific religion, faith or antireligious belief.

(Emphasis added).

The Commission first considered Life Coalition's application in August 2002. Members of the Commission raised concerns over whether the general public would believe Arizona had endorsed the message of the "Choose Life" license plate, as well as concerns over whether groups with differing viewpoints would file applications. To obtain legal advice, the Commission tabled Life Coalition's application without taking action.

To alleviate the Commission's concerns, Life Coalition filed a revised application on September 27, 2002. In this application Life Coalition proposed including its name on the plate design. The Commission considered Life Coalition's revised application in an August 2003 meeting. During the meeting, Gary Paisley, Chairman of Life Coalition, explained

how Life Coalition served the community: (1) it organized a diaper drive, after which Life Coalition donated thousands of diapers to the Arizona Diaper Bank; (2) "Life Coalition's purpose is to provide compassionate services to those people that are considering or have been affected by abortion including pregnancy tests, pregnancy counseling, and relationship counseling"; and (3) Life Coalition "established a hotline for women who are pregnant." Paisley also told the Commission that Life Coalition's membership included approximately 40 organizations and 100,000 individuals. Paisley then confirmed that a person or organization must subscribe to Life Coalition's statement of principles to become a member.[4]

Initially, the Commission declined to take action on Life Coalition's application. After Paisley implored the Commission to explain what statutory requirements Life Coalition failed to satisfy, a member of the Commission moved to formally deny the application, which passed by voice vote. Chairwoman Stanton replied to Paisley's request for an explanation by stating that "the action of the Commission is final" and that she did not believe "now is an opportunity for[ ] further debate, or for further info that [Life Coalition] could put on additional applications."

Life Coalition filed suit in the United States District Court for the District of Arizona on September 2, 2003. It filed its First Amended Verified Complaint on December 10, 2003. Pertinent to this appeal, Life Coalition moved for summary judgment on November 30, 2004, and the Commission cross-moved for summary judgment on January 1, 2005. The district court denied Life Coalition's motion for summary judgment, and granted the Commission's cross-motion for summary judgment. Life Coalition timely appealed. We reverse.

---

[4]Life Coalition's members must adhere to its stated secular principles. For example, one of Life Coalition's principles is to "believe in the sanctity of every innocent human life, from conception to natural death, regardless of age, gender, disability, or degree of dependence."

## II

We review de novo a grant of summary judgment. *Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999). The Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, imposes a jurisdictional limitation on federal courts. *Hoohuli v. Ariyoshi*, 741 F.2d 1169, 1176 (9th Cir. 1984), *overruled on other grounds as recognized by Arakaki v. Lingle*, 477 F.3d 1048, 1062 (9th Cir. 2007). We are required to raise jurisdictional issues sua sponte, *id.*, and we note the TIA's application in the special organization plate context has been raised by our sister circuits. *Compare Am. Civil Liberties Union of Tenn. v. Bredesen*, 441 F.3d 370, 373 (6th Cir. 2006) (rejecting the argument that the TIA barred suit because the extra payments for special organization plates resemble "payments for simple purchases from the government" and are not taxes), *with Henderson v. Stalder*, 407 F.3d 351, 356 (5th Cir. 2005) (concluding that the additional charges for speciality plates are taxes because they "sustain[ ] the essential flow of revenue to the government," are "imposed by a state or municipal legislature," and are "designed to provide a benefit for the entire community"). Therefore, although neither party questions whether the TIA precludes jurisdiction in this case, we nonetheless address it here.

**[1]** The TIA provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. In Arizona, drivers must pay an additional twenty-five dollar fee to obtain a special organization plate. The issue is whether the money paid to obtain a special organization plate constitutes a tax to which the TIA would apply.

**[2]** We find persuasive the Sixth Circuit's analysis in *Bredesen* and hold the extra fee is not a tax. The transaction between a state's vehicle owner and the issuing authority is more akin to a contractual debt than a state imposed tax. Ari-

zona has not coerced a sale attendant to the requirement that cars bear license plates to assist in identifying their owners, but has instead induced willing purchasers to agree to pay a certain extra sum of money in return for the right to bear a special message on an organizational license plate. *See Bredesen*, 441 F.3d at 374; *see also Women's Res. Network v. Gourley*, 305 F. Supp. 2d 1145, 1154 (E.D. Cal. 2004) ("[The additional payments are] voluntarily paid by a limited group of motorists who wish to both support a [special cause], and presumably desire to display that support on their license plate.").

**[3]** The Sixth Circuit's reasoning is supported by our decision in *Bidart Brothers v. California Apple Commission*, 73 F.3d 925 (9th Cir. 1996). There, we recognized that the additional charge does not have to be characterized as a "tax" or a regulatory "fee." *Id.* at 933. In determining whether the TIA applies, the "ultimate question remains whether an assessment is a 'State tax.' " *Id.* Because the additional charges for a special organization plate are more akin to a contractual payment than a tax, we hold that the TIA does not apply to Life Coalition's suit. We therefore retain jurisdiction to hear its federal constitutional claim.

## III

### A

#### 1

**[4]** We must decide whether, by authorizing a specialty license plate sought by a nonprofit organization to display its message and the message of the organization's members, the State of Arizona has adopted that speech as its own. It is undeniable that "when the government speaks for itself, it 'may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted.' " *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 792 (4th Cir. 2004)

(plurality) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)); *see also Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 616 (4th Cir.), *reh'g en banc denied*, 305 F.3d 241 (4th Cir. 2002) ("It is well established that 'the government can speak for itself.' " (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000)). However, when the government regulates private speech, we must conduct a traditional First Amendment analysis. *Rose*, 361 F.3d at 792; *see also PMG Int'l Div., L.L.C., v. Rumsfeld*, 303 F.3d 1163, 1169 (9th Cir. 2002).

There is some question as to what standard we should apply in differentiating between private and government speech. In *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), the Court addressed whether a federal program that requires beef producers to finance promotional messages to support the beef industry—"Beef. It's What's for Dinner"—violated the First Amendment. *Id.* at 554. The Court held that "[w]hen . . . the government sets the overall message to be communicated and approves every word that is disseminated," it is government speech. *Id.* at 561-62. And, because "[t]he message set out in the beef promotions is from beginning to end the message established by the Federal Government," "Congress . . . directed the implementation of a 'coordinated program' of promotion, 'including paid advertising, to advance the image and desirability of beef and beef products,' " and the Secretary of Agriculture "exercise[d] final approval authority over every word used in every promotional campaign," the beef promotional messages represented government speech. *Id.* at 560-61.

In *Bredesen*, 441 F.3d 370, the Sixth Circuit relied on *Johanns* to hold that the Tennessee statute authorizing a specialty license plate with a "Choose Life" logotype did not violate the First Amendment, despite the fact that the legislature refused to make available license plates with a "pro-choice" or "pro-abortion" message. *Id.* at 372. In doing so, the Sixth

Circuit rejected—on nearly identical facts—the Fourth Circuit's reasoning in *Rose*, 361 F.3d 786, in part because the Fourth Circuit had relied on the "pre-*Johanns* four-factor test." *See Bredesen*, 441 F.3d at 380.

[5] Prior to *Johanns*, the Fourth, Eighth, and Tenth circuits had adopted a nonexhaustive list of four factors to differentiate between the two types of speech. Those factors are:

> (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal speaker"; and (4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech, in analyzing circumstances where both government and a private entity are claimed to be speaking.

*Sons of Confederate Veterans, Inc.*, 288 F.3d at 618-19 (citing *Wells v. City and County of Denver*, 257 F.3d 1132, 1141 (10th Cir. 2001); *Knights of the Ku Klux Klan v. Curators of the Univ. of Mo.,* 203 F.3d 1085, 1093-94 (8th Cir. 2000)).[5]

---

[5]Although we have not yet expressly adopted the four-factor test, we relied on similar factors in *Downs v. Los Angeles Unified School District*, 228 F.3d 1003 (9th Cir. 2000). There, we addressed whether messages conveyed through school bulletin boards constituted government speech. *Id.* at 1011. We discussed various factors, including: (1) "who actually was responsible for the speech"; (2) who had access to the school bulletin boards; (3) who maintained editorial control over the bulletin boards; and (4) the purpose of the school bulletin boards. *Id.* at 1011-12. While recognizing that *Downs* cites similar factors, other circuits have declined to rely on its reasoning because of the special circumstances related to the school setting. *See Wells*, 288 F.3d at 1141 (stating that, "[d]ue to the 'special characteristics of the school environment,' [the court will] rely primarily on the four factors articulated in *Knights of the* [*Ku Klux Klan*]" (citation omitted)); *Sons of Confederate Veterans, Inc.*, 288 F.3d at 619 n.7 (same).

As noted by Judge Martin in his dissenting opinion in *Bredesen*, *Johanns* is factually distinguishable from these specialty license plate cases. 441 F.3d at 385 (Martin, J., dissenting). *Johanns* involved a government-compelled subsidy of government speech. *Johanns*, 544 U.S. at 557. Specialty license plate programs do not raise issues regarding "compelled-speech" or a "compelled-subsidy." *See id.* (discussing the difference between "compelled-speech" cases and "compelled-subsidy" cases); *see generally Paramount Land Co. v. Cal. Pistachio Comm'n*, 491 F.3d 1003 (9th Cir. 2007) (applying *Johanns* in a compelled-speech case). In *Johanns*, the individual harm was "being forced to give the government money to pay for someone else's message." *Bredesen*, 441 F.3d at 385 (Martin, J., dissenting). In specialty license plate cases, private individuals choose to pay the price for obtaining a particular specialty license plate. The First Amendment harm "is being denied the opportunity to speak on the same terms as other private citizens within a government sponsored forum." *Id.* at 386. Moreover, "specialty plate programs are not part of a larger governmental scheme to encourage some private activity, like beef consumption." Andy G. Olree, *Specialty License Plates: Look Who's Talking in the Sixth Circuit*, 68 Ala. Law. 213, 214 (May 2007). In light of these differences, Judge Martin believed that "[t]he government speech doctrine, as it is used in *Johanns*" is inapplicable to specialty license plate cases such as this. *Bredesen*, 441 F.3d at 385.

[6] Although we agree with Judge Martin in that *Johanns* is factually distinguishable, we believe that *Johanns* is instructive when determining whether the message constitutes government or private speech. In concluding that the beef program represented government speech, the Court relied on factors similar to those set forth in the four-factor test. It considered who controlled the speech, 544 U.S. at 560-61, the purpose of the program, *id.* at 561, and the fact that the Secretary of Agriculture exercised final editorial control over the promotional campaign, *id.* We therefore adopt the Fourth Cir-

cuit's four-factor test—supported by the Supreme Court's decision in *Johanns*—to determine whether messages conveyed through Arizona's special organization plate program constitute government or private speech.

**2**

**i**

The Commission argues that the "primary function of Arizona license plates—including special plates—is the State's need to identify a vehicle and its owner." It cites *Kahn v. Department of Motor Vehicles*, 16 Cal. App. 4th 159 (Cal. Ct. App. 1993), where the California Court of Appeal stated:

> A vehicle license plate is a state-imposed display of registered vehicle identification. That the state permits license holders, for an additional fee, to vary minimally their vehicle identification from the prescribed form by selecting letter and/or number combinations which may reflect an individual's personal or professional identity, or possibly express a thought or idea, is purely incidental to the primary function of vehicle identification.

*Id.* at 166. Life Coalition argues that the speciality license plates offer something more: "the opportunity to identify themselves with individualized messages via these specialized plates" as well as "the opportunity to benefit worthy organizations financially."

We agree with Life Coalition. While the primary purpose of any vehicle license plate is vehicle identification and registration, we are not concerned with the general validity of Arizona's licensing requirements. *Cf. Rose*, 361 F.3d at 793 (stating that the primary purpose of a South Carolina statute authorizing a specialty license plate with the words "Choose Life" was "to promote the State's preference for the pro-life

position"); *Sons of Confederate Veterans, Inc.*, 288 F.3d at 619-20 (stating that the primary purpose of Virginia's special plate program is to collect revenue); *Choose Life Illinois, Inc. v. White*, 2007 WL 178455, *5 (N.D. Ill. Jan. 19, 2007) (concluding that the purpose of the Illinois specialty plate program is to "raise revenue for the state as well as to allow for some private expression"). Rather, we must address Arizona's *speciality license plate* program as a whole. *See Sons of Confederate Veterans, Inc.*, 288 F.3d at 619.

[7] By allowing organizations to obtain speciality license plates with their logo and motto, Arizona is providing a forum in which philanthropic organizations, *see* Ariz. Rev. Code § 28-2404(B), can exercise their First Amendment rights in the hopes of raising money to support their cause. *See* Ariz. Rev. Code § 28-2402(1) (setting the fee for specialty license plates at twenty-five dollars); *id.* § 28-2404(F) (stating that eight dollars of the fee is a specialty plate administration fee and seventeen dollars is an annual donation to the organization). As in *Sons of Confederate Veterans, Inc.*, the fee structure for Arizona speciality plates suggests the program's revenue-producing aim. *See* 288 F.3d at 619. Before obtaining approval from the Department, the organization must certify that it either has 200 members or that it will agree to pay the production and program costs for the special organization plate. Ariz. Rev. Code § 28-2404(G)(2); *cf. Sons of Confederate Veterans, Inc.*, 288 F.3d at 620 ("The very structure of the program [—requiring 350 prepaid applicants—] ensures that only special plate messages popular enough among private individuals to produce a certain amount of revenue will be expressed.").

[8] The revenue raising purpose of the Arizona special organization plate program supports a finding of private speech.

## ii

[9] The Commission's de minimis editorial control over the plate design and color does not support a finding that the *mes-*

*sages* conveyed by the organization constitute government speech. The Arizona legislature has chosen to limit the license plate forum to only those organizations that "serve[ ] the community, contribute[ ] to the welfare of others and [are] not offensive or discriminatory in [their] purpose, nature, activity or name." Ariz. Rev. Stat. § 28-2404(B). In addition, the organizations cannot "promote a specific religion, faith or antireligious belief." *Id.*

However, as Life Coalition notes in its brief, the statutory requirements address who may speak, not what they may say. For instance, in *Rose*, the "Choose Life" license plate "originated with the State, and the legislature determined that the plate will bear the message 'Choose Life.' " 361 F.3d at 793. Therefore, the state exercised control over the substantive content of the speech. *Cf. Sons of Confederate Veterans, Inc.*, 288 F.3d at 621 (noting that Virginia's license plate design criteria "do[ ] not contain guidelines regarding the substantive content of the plates or any indication of reasons, other than failure to comply with size and space restrictions"); *see also Johanns*, 544 U.S. at 561 (noting that the Secretary's role in the beef campaign extended beyond granting final approval or rejection; government officials "also attend[ed] and participat[ed] in the open meetings at which *proposals [we]re developed*" (emphasis added)).

**[10]** In this case, the idea of a "Choose Life" license plate originated with Life Coalition. While the Commission determined whether Life Coalition met the statutory guidelines for gaining access to the license plate forum, Life Coalition determined the substantive content of their message. *Cf. Wells*, 257 F.3d at 1142 (concluding that this factor weighed in favor of government speech because "there [wa]s no indication that any of the [private speakers] even knew about the Happy Holidays sign, much less exercised any editorial control over its design or content"); *Choose Life Illinois*, 2007 WL 178455, at *6 (stating that this factor weighed in favor of private speech because "the idea and message of the Choose Life

plate originated with a private organization, Choose Life Illinois, not the legislature").

**[11]** Therefore, this factor weighs in favor of private speech.

### iii

**[¶12]** "[O]wnership of the means of communication [i]s a valid consideration in determining whether [the license plate] contained government speech." *Sons of Confederate Veterans, Inc.*, 288 F.3d at 621; *Wells*, 257 F.3d at 1142. Therefore, the fact that Arizona owns the special organization plates supports a finding that the State is the literal speaker. However, in *Wooley v. Maynard*, 430 U.S. 705 (1997), the Supreme Court indicated that messages conveyed through license plates "implicate private speech interests because of the connection of any message on the plate to the driver or owner of the vehicle." *Sons of Confederate Veterans, Inc.*, 288 F.3d at 621 (discussing *Wooley*, 430 U.S. at 714-15); *see also Johanns*, 544 U.S. at 557 ("[In *Wooley*,] we held that requiring a New Hampshire couple to bear the State's motto, 'Live Free or Die,' on their cars' license plates was an impermissible compulsion of expression.").[6] Relying on *Wooley*, most

---

[6]In a letter of supplemental authority filed after oral argument, the Commission directs us to the following statement from *Pacific Gas & Electric Co. v. Public Utilities Commission of Cal.*, 475 U.S. 1 (1986):

> In *Wooley v. Maynard*, we held that New Hampshire could not require two citizens to display a slogan on their license plates and thereby "use their private property as a 'mobile billboard' for the State's ideological message." The "private property" that was used to spread the unwelcome message was the automobile, not the license plate.

*Id.* at 17 (citation omitted). That statement does not undermine the sentiment, taken from *Wooley*, that license plate messages implicate private speech. *See Johanns*, 544 U.S. at 557. We have no doubt that New Hampshire's motto, "Live Free or Die," constitutes government speech. Nevertheless, it *still* implicated private speech interests because private individuals were being compelled to spread that message through the use of their vehicle. Here, however, the question is whether the message displayed on the license plate is itself private speech.

courts that have addressed vanity plates have concluded the messages are private speech. *Sons of Confederate Veterans, Inc.*, 288 F.3d at 621 & n.9; *see also Rose*, 361 F.3d at 794 ("The literal speaker of the Choose Life message on the specialty plate therefore appears to be the vehicle owner, not the State, just as the literal speaker of the bumper sticker message is the vehicle owner, not the producer of the bumper sticker."); *Perry v. McDonald*, 280 F.3d 159, 166 (2d Cir. 2001) (stating that a restriction on vanity plates "concern[ed] private individuals' speech on government-owned property"); *Lewis v. Wilson*, 253 F.3d 1077, 1079 (8th Cir. 2001) (characterizing a restriction on vanity plates as a restriction on private speech); *Choose Life Illinois*, 2007 WL 178455, *6 (concluding that a private individual is the literal speaker with specialty plates because they pay an extra fee to express a certain message).

[13] This factor has characteristics of both private and government speech. Nevertheless, in this situation, where Life Coalition's logo depicting the faces of two young children will also be displayed on the license plate supporting the message "Choose Life," we conclude that it weighs in favor of finding this to be primarily private speech.

**iv**

[14] The question of who bears "ultimate responsibility" for the "Choose Life" license plate is very similar to the question of who is the literal speaker. *See Rose*, 361 F.3d at 794; *Sons of Confederate Veterans, Inc.*, 288 F.3d at 621. "[P]rivate individual[s] choose[ ] to spend additional money to obtain the plate and to display its pro-life message[s] on [their] vehicle." *Rose*, 361 F.3d at 794. Here, Life Coalition submitted its motto to be placed on a speciality license plate that would also identify the organization by name. Life Coalition controlled the message of its special organization plate, and the individual members who choose to purchase the plate voluntarily choose to disperse that message. *Cf. Johanns*, 544

U.S. at 561 (noting that Congress directed implementation of the promotional plan and that Congress and the Secretary determined what the promotional campaigns shall contain); *Rose*, 361 F.3d at 794 (finding that the drivers bore ultimate responsibility for the "Choose Life" license plate authorized by the State legislature).

It is true that, like the Secretary in *Johanns*, Arizona developed the program that allows nonprofit organizations such as Life Coalition to obtain specialty license plates. However, in *Johanns* the beef producers had no choice but to support the beef ad. In comparison, there is nothing in the record to even suggest that Arizona intended to adopt the message of each special organization plate as its own state speech. Instead, the burden is on the nonprofit organization. If it wants to convey a certain message through the Arizona specialty plate program, it must take the affirmative step of submitting an application. This suggests that it is Life Coalition, rather than the State of Arizona, that bears ultimate responsibility for the content of the speech.

**[15]** We therefore hold that the "Choose Life" message displayed through a speciality license plate if issued by Arizona would constitute private speech.

**B**

**1**

Having determined that the "Choose Life" message would represent private speech, we must now determine whether the Commission has acted appropriately under the First Amendment. The first step in assessing a First Amendment claim relating to private speech on government property is to "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002) (quoting *Cornelius*

*v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985)). In defining the forum, we must focus "on the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property. In cases in which limited access is sought, [the Supreme Court's] cases have taken a more tailored approach to ascertain[ ] the perimeters of a forum within the confines of the government property." *Cornelius*, 473 U.S. at 801 (citation omitted). Here, the forum is Arizona license plates. *Cf. Lehman v. City of Shaker Heights*, 418 U.S. 298, 300 (1974) (treating the advertising spaces on city owned buses as the forum).

**[16]** "[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802. In a designated public forum, speakers cannot be excluded unless it is "necessary to serve a compelling state interest" and the exclusion is "narrowly drawn to achieve that interest." *Sammartano*, 303 F.3d at 965 (internal quotation marks omitted). We have further refined the concept of "designated" public forum by carving out a subcategory we call a "limited" public forum. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) ("[A] limited public forum is a sub-category of a designated public forum that 'refer[s] to a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics.'" (alteration in original) (quoting *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999))). The government may restrict speech in limited public fora so long as the restrictions are "viewpoint neutral and reasonable in light of the purpose served by the forum." *Id.* at 1075 (internal quotation marks omitted).

The designated and limited public forum classifications "ha[ve] been the source of much confusion." *Id.* at 1074. A limited public forum exists when the government intentionally opens a nonpublic forum to expressive activity by a cer-

tain class of speakers to address a particular class of topics. *Cogswell v. City of Seattle*, 347 F.3d 809, 814 (9th Cir. 2003) (citing *Kaplan v. County of Los Angeles*, 894 F.2d 1076, 1080 (9th Cir. 1990) (finding a limited public forum when "California created the [voters'] pamphlets for the specific purpose of allowing a limited class of speakers, the candidates, to address a particular class of topics, statements concerning the personal background qualifications of each candidate")).

**[17]** We have no trouble concluding that Arizona's purpose was to open up its license plate forum to a certain class of organizations for expressive activity. *Cf. Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 908 (9th Cir. 2007) (stating that the County intended to open its library meeting room to expressive activity when it allowed all "[n]on-profit and civic organizations, for-profit organizations, schools and governmental organizations" to use the meeting room for "meetings, programs, or activities of educational, cultural or community interest") (internal quotation marks omitted). As the Commission correctly notes in its brief, "[h]istorically, Arizona's license plates have served the purely governmental function of vehicle and vehicle owner identification and have been a nonpublic forum." However, Arizona took the affirmative step by passing its special license plate legislation of allowing limited access to license plates publicly displayed for expressive conduct as vehicles are driven throughout the state. *See Sons of Confederate Veterans, Inc. v. Holcomb*, 129 F. Supp. 2d 941, 948 (W.D. Va. 2001) (stating, in dicta, that "allowing groups to place various slogans and designs on license plates represents the Commonwealth's intentional action to open up a nontraditional forum for public discourse").

Arizona's speciality plate program encompasses a wide range of philanthropic organizations with community based programs/ideals. Section 28-2404(B) states that the Commission *shall* authorize a speciality license plate to all nonprofit organizations that (1) "serve[ ] the community, contribute[ ]

to the welfare of others and [are] not offensive or discriminatory in [their] purpose, nature, activity or name"; (2) has an organizational name or purpose that "does not promote any specific product or brand name . . . provided for sale"; and (3) the organizations do not "promote a specific religion, faith, or antireligious belief."

Applying this statutory mandate, the Commission has authorized, and the Department has issued, the following special organization plates: (1) The University of Phoenix Alumni Network (bearing the University's identifier, "Univ. of Phoenix"); (2) Associated Fire Fighters of Arizona (bearing the Union's motto, "Professional Fire Fighters"); (3) Fraternal Order of Police (bearing the Order's identifier, "Fraternal Order of Police"); (4) Legion of Valor (bearing the Legion's identifier, "Legion of Valor"); and (5) Wildlife Conservation Council (bearing the Council's motto, "Conserving Wildlife").[7] In addition, the Commission has authorized six additional license plates, but at the time of briefing this appeal we were told the Department had yet to issue them because of factors unrelated to this appeal: (1) Civil Air Patrol; (2) Arizona Association of Future Farmers of America; (3) Rotary International; (4) Arizona Hospice Palliative Care Organizations; (5) Red Means Stop Coalition; and (6) Arizona Historical Society.

Nevertheless, "[a] policy with a broad purpose . . . is not dispositive of an intent to create a public forum by designation." *Faith Ctr. Church Evangelistic Ministries*, 480 F.3d at 909. We must therefore look closely at the Commission's policy and practice to determine whether Arizona intended the speciality plate forum to be "open for indiscriminate use." *Id.* In other words, if Arizona intended only to open the forum to "certain groups or to certain topics," it has created only a lim-

---

[7]The parties stipulated to this fact in filings before the district court. We do not know whether, since the inception of this appeal, the Commission has authorized the making of any other speciality license plates.

ited public forum. *Cogswell*, 347 F.3d at 814 (internal quotation marks omitted). For instance, despite Contra Costa County's broad purpose in opening its library meeting room to public use, we held in *Faith Center Church Evangelistic Ministries* that the County created a limited public forum because the "County's policy excludes schools from using the meeting room 'for instructional purposes as a regular part of the curriculum' and organizations who wish to engage in 'religious services.' " 480 F.3d at 909. In addition, "the policy requires a potential user to submit an application describing the intended use and identifying the applicant," and the "application must be reviewed and approved in advance by the County." *Id.*

**[18]** Similarly, Arizona by statute restricts its speciality license plate program to only nonprofit organizations with community driven purposes that do not promote a specific religion, faith or antireligious belief. Ariz. Rev. Stat. § 28-2404(B). To gain access, the nonprofit organization must have its application reviewed and approved by the Commission. *Cf. Cornelius*, 473 U.S. at 803; *Perry*, 280 F.3d at 168 (citing the fact that Vermont vehicle owners must obtain permission to receive vanity plates to support its finding of a nonpublic forum). These are not abstract policy statements, but are definite and unambiguous restrictions on gaining access to the forum. *See Hopper*, 241 F.3d at 1077 (citing *Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242 (3d Cir. 1998)).

**[19]** From the record before us, it is also clear that the Commission has consistently applied the access restrictions when reviewing pending applications. *See Faith Ctr. Church Evangelistic Ministries*, 480 F.3d at 909 (citing *Hopper*, 241 F.3d at 1076 ("[C]onsistency in application is the hallmark of any policy designed to preserve the non-public status of a forum.")). In addition to Life Coalition's application, the Commission has denied two other applications for speciality license plates. The Commission unanimously denied Interna-

tional Dark Sky Society's application because its suggested "dark blue sky" motif would replace the standard Arizona license plate motif in violation of other statutory requirements. *See* Ariz. Rev. Stat. § 28-2403(a)(2). The Commission also denied an application submitted by Embry-Riddle Aeronautical University, explaining that Arizona universities had to obtain legislative plates, whereas only alumni associations may obtain the special organization license plates. In comparison to the city in *Hopper*, through the License Plate Commission, Arizona has retained some substantive control over the content of its speciality license plate program. *See* 241 F.3d at 1078 (stating that the city failed to consistently enforce its "non-controversy" policy as it "neither pre-screened submitted works, nor exercised its asserted right to exclude works").

[20] Finally, we note that the nature of the forum also supports a conclusion that Arizona intended only to create a limited public forum. *See Faith Center Church Evangelical Ministries*, 480 F.3d at 910. As the Second Circuit noted in *Perry*, the primary purpose in issuing license plates in general is to aid in vehicle identification. 280 F.3d at 167. However, one of the primary purposes in issuing vanity license plates (and, in turn, special organization plates) is to raise revenue. *Id.* Nevertheless, given the general overarching purpose of aiding in vehicle identification, expression through vanity plates (and, in turn, special organization plates) is subject to numerous restrictions with the general public having only limited access. *Id*. We therefore conclude that Arizona's speciality license plate program is a limited public forum, and that any access restriction must be viewpoint neutral and reasonable in light of the purpose served by the forum. *See Faith Center Church Evangelical Ministries*, 480 F.3d at 910 (citing *Cornelius*, 473 U.S. at 806).

**2**

**i**

The distinction between viewpoint discrimination and content-based discrimination is not precise. *Rosenberger*, 515

U.S. at 831. The Commission contends that it did not engage in viewpoint discrimination because it "did not grant a special organization plate to a group with a viewpoint in opposition to Life Coalition's" and therefore, "[n]either side of the 'Choose Life' issue is represented by a special organization plate." The Supreme Court rejected a similar argument in *Rosenberger*, where it found a First Amendment violation when a public university withheld funding to a student publication because its paper "primarily promote[d] or manifest[ed] a particular belie[f] in or about a deity or an ultimate reality." 515 U.S. at 823 (internal citations omitted; alterations in original). The dissent argued that the University did not engage in viewpoint discrimination because it limited all religious speech, both theistic and atheistic. *Id.* at 831. The majority rejected this argument, stating

> The dissent's assertion that no viewpoint discrimination occurs because the Guidelines discriminate against an entire class of viewpoints reflects an insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech. Our understanding of the complex and multifaceted nature of public discourse has not embraced such a contrived description of the marketplace of ideas. If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic or social viewpoint.

*Id.*

[21] Unlike the University system in *Rosenberger*, the Arizona statutes do not expressly prohibit abortion-related speech in the license plate forum. *Cf. id.* (stating that the Guidelines prohibit religious activity). Rather, the State has opened this

forum to all organizations that serve the community and contribute to the welfare of others in a nondiscriminatory way. Ariz. Rev. Stat. § 28-2404(B)(1). The Commission does not argue that Life Coalition failed to meet this statutory requirement. Instead, the only justification the Commission can give for denying Life Coalition's application is that it chose not to enter the Choose Life/Pro-Choice debate. And "where the government is plainly motivated by the nature of the message rather than the limitations of the forum or a specific risk within that forum, it is regulating a viewpoint rather than a subject matter." *Sammartano*, 303 F.3d at 971; *see also Choose Life Illinois, Inc.*, 2007 WL 178455, *8 (stating in dicta that the denial of an application for a "Choose Life" license plate because it is "controversial" amounts to viewpoint discrimination).

Moreover, during the August 2002 hearing, the Commissioners expressed concerns that, if they granted Life Coalition's application, groups with opposing viewpoints would file applications for their own special organization plate. Preventing Life Coalition from expressing its viewpoint out of a fear that other groups would express opposing views seems to be a clear form of viewpoint discrimination. As we previously stated in *Hopper*, "[a] ban on 'controversial [speech]' may all too easily lend itself to viewpoint discrimination." 241 F.3d at 1079. Restrictions based on community standards of decency must be based on "objective criteria set out in advance." *Id.* at 1080.

Admittedly, this is a difficult issue. "The line between an acceptable subject matter limitation and unconstitutional viewpoint discrimination is not a bright one." *Cogswell*, 347 F.3d at 815. One thing is clear, "once the government has chosen to permit discussion of certain subject matters, it may not then silence speakers who address those subject matters from a particular perspective." *Id.*

[22] Arizona has created a limited public forum for nonprofit organizations. The only substantive restriction is that

the license plate cannot promote a specific product for sale, or a specific religion, faith, or antireligious belief. Nowhere does the statute create objective criteria for limiting "controversial" material, and nowhere does the statute prohibit speech related to abortion. *Cf. Cogswell*, 347 F.3d at 815 (finding restriction prohibiting candidates from discussing their opponents' views viewpoint neutral because the limited public forum was limited to candidate self-discussion and the submitted material included subject matter not included in the limited public forum). Consequently, because abortion-related speech falls within the boundaries of Arizona's limited public forum, and because the Commission clearly denied the application based on the nature of the message, we conclude the Commission's actions were viewpoint discriminatory.

**ii**

We also hold that the Commission acted unreasonably by denying Life Coalition's application for reasons not statutorily based or related to the purpose of the limited public forum. "The reasonableness of a governmental restriction limiting access to a nonpublic forum must be assessed 'in light of the purpose of the forum and all of the surrounding circumstances.'" *Id.* at 817 (quoting *Cornelius*, 473 U.S. at 789). "The reasonableness analysis emphasizes the consistency of the limitation in the context of the forum's intended purpose." *Id.*

[23] The Commission, in fulfilling the legislature's intent to allow nonprofit organizations a means to promote their community-based cause to the public in the hopes of raising awareness and revenue, regulates access to the forum to preserve its community-based function and protect the primary function of license plates: to aid in vehicle identification. The Commission does not dispute that Life Coalition has met each of the statutory requirements. It is an organization that benefits the community without promoting the sale of a product or any religious, faith, or antireligious belief. Nor does the Com-

mission contend that Life Coalition's special organization plate will interfere with vehicle identification. In other words, it fits within the program's purpose. When an organization meets the requirements, the statute provides that "[t]he [C]ommission *shall* authorize a special organization plate." Ariz. Rev. Stat. § 28-2404(B) (emphasis added). By denying Life Coalition's application, although the organization and its message complied with the limited public forum's purpose as it is currently defined under Arizona law, the Commission ignored its statutory mandate and acted unreasonably in violation of the First Amendment to the United States Constitution.[8]

## IV

We recognize that Arizona has a legitimate interest in regulating controversial material displayed publicly on government property. Nevertheless, we are mindful of potential constitutional problems when government officials are given unbridled discretion in regulating speech, even in limited public fora. Arizona has defined the outer limits of its speciality license plate program, and Life Coalition fits within those statutory boundaries. Because the Commission denied Life Coalition's application on a ground not expressly related to the forum's purpose by discriminating on the basis of the viewpoint contained in its proposed message, we conclude that the Commission acted in violation of the First Amendment. We therefore reverse the district court's grant of summary judgment in favor of the Commission. The cause is remanded for entry of judgment in favor of Arizona Life Coalition on its First Amendment claim and such further proceedings as are necessary to ensure that its specialty license

---

[8]Given our holding, we will not address Life Coalition's claim that the Commission also violated its equal protection rights under the Fourteenth Amendment, or that section 28-2404 is unconstitutionally vague. *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 797 n.15 (9th Cir. 2006) (declining to address equal protection arguments after finding the ordinance violated the First Amendment); *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 571 n.11 (9th Cir. 1984) (same).

plate application is approved by the Arizona License Plate Commission.

**REVERSED and REMANDED**.