In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-1349

CHOOSE LIFE ILLINOIS, INCORPORATED,
RICHARD BERGQUIST, SUE BERGQUIST, et al.,

*Plaintiffs-Appellees,*

*v.*

JESSE WHITE, Secretary of State
of the State of Illinois,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 4316—**David H. Coar**, *Judge.*

ARGUED NOVEMBER 27, 2007—DECIDED NOVEMBER 7, 2008

Before MANION, EVANS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Choose Life Illinois, Inc. ("CLI"),
collected more than 25,000 signatures from Illinois resi-
dents interested in purchasing a "Choose Life" specialty
license plate and applied to the Secretary of State for
issuance of the plate under 625 ILL. COMP. STAT. 5/3-600(a)
(amended effective 2008). That statute prohibits the

Secretary from issuing a new line of specialty plates unless he has a minimum number of applications on file, and CLI's 25,000 signatures far exceeded the minimum. Since 1948, however, when Illinois authorized its first specialty license plate, almost no specialty plate had been issued without prior legislative approval. The Secretary referred CLI to the General Assembly for enabling legislation.

CLI hit a roadblock in the General Assembly. Despite the strong showing of support, the proposal for a "Choose Life" license plate died in subcommittee. CLI turned to federal court for relief, claiming that the Secretary was authorized to issue the plates without legislative approval once CLI met the statutory requirements and that his failure to do so constituted impermissible viewpoint discrimination in violation of the First Amendment. If legislative approval was required, CLI claimed the General Assembly's refusal to adopt the "Choose Life" license plate was viewpoint discrimination. The district court accepted the first of these arguments and ordered the Secretary to issue the "Choose Life" plate, but stayed its judgment pending appeal.

In the meantime, the General Assembly resolved CLI's first claim by amending 625 ILL. COMP. STAT. 5/3-600 to require *express* prior legislative approval before the Secretary may issue new specialty plates. As to the second claim, the Secretary now argues that the amendment reinforces his position that the messages on specialty license plates are the government's own speech—not private or a mixture of government and private speech—and therefore no First Amendment

rights are implicated. We disagree, though we acknowledge the question has divided other circuits.[1]

Specialty license plates implicate the speech rights of private speakers, not the government-speech doctrine. This triggers First Amendment "forum" analysis, and we conclude specialty plates are a nonpublic forum. Illinois may not discriminate on the basis of viewpoint, but it may control access to the forum based on the content of a proposed message—provided that any content-based restrictions are reasonable. The distinction between content and viewpoint discrimination makes a difference here.

It is undisputed that Illinois has excluded the *entire subject* of abortion from its specialty-plate program; it has authorized neither a pro-life plate nor a pro-choice plate. It has done so on the reasonable rationale that messages on specialty license plates give the appearance of having the government's endorsement, and Illinois does not wish to be perceived as endorsing *any* position on the subject of abortion. The State's rejection of a

---

[1] *Compare Ariz. Life Coal., Inc. v. Stanton*, 515 F.3d 956, 965-68 (9th Cir. 2008) (private speech), *Planned Parenthood of S.C., Inc. v. Rose*, 361 F.3d 786, 793-95, *reh'g en banc denied*, 373 F.3d 580 (4th Cir. 2004) (mix of government and private speech), *and Sons of Confederate Veterans, Inc. v. Comm'r of the Va. Dep't of Motor Vehicles*, 288 F.3d 610, 617-21, *reh'g en banc denied*, 305 F.3d 241 (4th Cir. 2002) (private speech), *with Am. Civil Liberties Union of Tenn. v. Bredesen*, 441 F.3d 370, 378-79 (6th Cir. 2006) (government speech).

"Choose Life" license plate was thus content based but viewpoint neutral, and because it was also reasonable, there is no First Amendment violation. We reverse the judgment of the district court.

## I.  Background

### A.  Specialty License Plates in Illinois

For an extra fee, Illinois will permit a vehicle owner to have a specialized license plate that, in addition to the generic or personalized numbers and characters required for license identification, also bears a specific message or symbol. *See* 625 ILL. COMP. STAT. 5/3-600 *et seq.* Like most other states, Illinois offers a broad selection of specialty plates. Some denote that the vehicle owner is an alumnus of a certain college or university (schools in Illinois and contiguous states qualify) or a member of a civic organization (e.g., the Knights of Columbus or the Masons). *Id.* 5/3-629, 635. Others signify support for a particular cause, such as a love of pets ("I am pet friendly"); opposition to violence (the dove of peace symbol); mammogram or organ-donor awareness ("Mammograms Save Lives," "Be An Organ Donor"); or prevention of childhood cancer ("Stop Neuroblastoma").[2] *See id.* 5/3-653, 630, 643, 646, 654.

---

[2] Some specialty plates are issued at no extra charge to persons who have achieved some noteworthy distinction, such as being awarded the Silver Star, having served in World War II, or holding a public office. 635 ILL. COMP. STAT. 5/3-642, 647, 639.

With insignificant historical exceptions, each specialty license plate in Illinois has its own authorizing statute describing the plate and establishing the required additional fee. These statutes typically allocate a portion of the proceeds from the sale of the plates to the specific state or local program that corresponds to the message or to the not-for-profit or charitable organization that sponsored the plate. (For example, proceeds from the "Park District Youth" plate benefit local park and recreational districts; the "Police Memorial" plate benefits the Police Memorial Committee Fund. *See id.* 5/3-654, 644.) Beyond their obvious utility as a means of promoting a message or cause, specialty license plates thus also serve a fundraising purpose for units of state and local government and for private organizations.

The basic requirements for issuance of a new specialty-plate series are set forth in 625 ILL. COMP. STAT. 5/3-600, enacted in 1990. Until recently, that statute provided as follows:

> (a) The Secretary of State shall not issue a series of special plates unless applications, as prescribed by the Secretary, have been received for 10,000 plates of that series; except that the Secretary of State may prescribe some other required number of applications if that number is sufficient to pay for the total cost of designing, manufacturing and issuing the special license plate.

> . . . .

> (c) This Section shall not apply to special license plate categories in existence on the effective date of this

> amendatory Act of 1990, or to the Secretary of State's discretion as established in Section 3-611 [relating to specialty plates for specific categories of persons, typically elected officials].

*Id.* (amended effective 2008). Although the statute specifies a default minimum of 10,000 applications, the Secretary often required far less (approximately 800 applications) before issuing a new legislatively approved specialty plate. That lesser number was usually enough to make the program financially feasible from a manufacturing standpoint. Illinois currently has about 60 specialty license plates available for purchase.

## B. CLI's Quest for a "Choose Life" Specialty License Plate

CLI is a not-for-profit agency that promotes adoption in the State of Illinois. In 2001 CLI embarked on an initiative to obtain approval for a specialty license plate bearing the words "Choose Life." To that end CLI collected more than 25,000 signatures from prospective purchasers and applied to the office of Illinois Secretary of State Jesse White for issuance of the plate. The Secretary informed CLI that he could not issue a new specialty plate that had not been approved by the General Assembly. For the next several years, CLI waged a legislative battle for approval of its "Choose Life" specialty license plate, lining up support among sympathetic legislators. Its efforts were thwarted, however—initially in the Illinois Senate and later in the House. (The proposal died in a House subcommittee.)

CLI and several individual plaintiffs then brought this suit against the Secretary for violating their free-speech rights. The parties filed cross-motions for summary judgment. CLI first argued that the Secretary had authority under section 5/3-600 to issue the "Choose Life" plates without legislative approval, and his refusal to do so constituted viewpoint discrimination within a government-created forum for private speech. Alternatively, CLI claimed that if legislative approval was required, it had been subjected to impermissible viewpoint discrimination by the General Assembly. CLI also claimed the specialty-plate program was facially unconstitutional because the lack of any governing standards invited discrimination against disfavored messages. CLI asked the district court to order the Secretary to issue the "Choose Life" plate or shut down the entire specialty-plate program.

The Secretary argued that although section 5/3-600 was silent on whether an enabling statute was required for a new specialty-plate series, all specialty plates in Illinois (other than those grandfathered under section 5/3-600(c)) had in fact been authorized by specific statutory enactment. Accordingly, the Secretary argued, the messages on specialty license plates were government speech, and the free-speech rights of the plaintiffs as private speakers were not implicated. The Secretary maintained in the alternative that even if the specialty-plate program amounted to a forum for private speech, it was a nonpublic forum and the State's decision to exclude the entire subject of abortion from the forum was a reasonable viewpoint-neutral restriction on content and was therefore constitutionally permissible.

The district court granted summary judgment for CLI. The court interpreted section 5/3-600 as permitting the Secretary to issue new specialty license plates without specific enabling legislation. Applying the four-factor test from *Sons of Confederate Veterans, Inc. v. Commissioner of the Virginia Department of Motor Vehicles*, 288 F.3d 610, 618 (4th Cir. 2002), a Fourth Circuit license-plate case, the court concluded that the Illinois specialty-plate program established a forum for private speech and that the exclusion of the "Choose Life" message from this forum was viewpoint discrimination and could not withstand strict scrutiny. The court ordered the Secretary to issue the "Choose Life" license plates, but stayed its order pending appeal.

In response to the district court's decision, and while this appeal was pending, the General Assembly amended section 5/3-600 to include an explicit requirement of legislative approval for any new specialty license plate. Effective January 1, 2008, the statute provides: "The Secretary of State shall issue only special plates that have been authorized by the General Assembly." Act of Aug. 23, 2007, Ill. Pub. Act No. 95-0359.

## II. Analysis

Our standard of review is de novo. *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002). The material facts are undisputed. The question presented is whether the messages on specialty license plates are the government's own speech or private speech, and if the latter, whether the exclusion of CLI's proposed "Choose Life"

plate from the "specialty-plate forum" violates the Free Speech Clause of the First Amendment.[3]

---

[3] We note that some specialty-license-plate cases in other circuits have been dismissed on jurisdictional grounds, notably for lack of standing or by application of the Tax Injunction Act, 28 U.S.C. § 1341. *See Henderson v. Stalder*, 407 F.3d 351, 358 (5th Cir. 2005) (plaintiffs' challenge to Lousiana's "Choose Life" license plate barred by the Tax Injunction Act); *Women's Emergency Network v. Bush*, 323 F.3d 937, 946-47 (11th Cir. 2003) (holding that plaintiffs lacked standing to challenge Florida's "Choose Life" license plate under either the Establishment Clause or the Free Speech Clause of the First Amendment); *Henderson v. Stalder*, 287 F.3d 374, 382 (5th Cir. 2002) (plaintiffs lacked standing to challenge Louisiana's "Choose Life" license plate on free-speech grounds). On the other hand, plaintiffs in other circuits have successfully established standing and prevailed on the argument that the Tax Injunction Act does not apply. *See Stanton*, 515 F.3d at 963-64 (Tax Injunction Act does not apply to plaintiff advocacy group's claim that Arizona committed viewpoint discrimination in denying its application for a "Choose Life" license plate); *Bredesen*, 441 F.3d at 373-74 (Tax Injunction Act does not bar plaintiffs' claim that Tennessee's "Choose Life" license plate violates the First Amendment); *Rose*, 361 F.3d at 789-92 (plaintiffs have standing to challenge South Carolina's "Choose Life" license plate on viewpoint-discrimination grounds). We are satisfied CLI and the individual plaintiffs have standing; they have adequately alleged an injury by reason of the exclusion of their "Choose Life" message from Illinois' specialty-plate program. And we agree with the Ninth and Sixth Circuits that the Tax Injunction Act does not apply.

### A.  The District Court's Interpretation of the Unamended Statute

A considerable amount of the parties' initial briefing concerned the proper interpretation of unamended 625 ILL. COMP. STAT. 5/3-600. The district court read the statute to permit the Secretary to issue new specialty license plates without a specific authorizing statute upon presentation of the minimum required number of applications. There is reason to doubt this interpretation. The statute is phrased not as a positive grant of authority to *approve* a new plate series but as a limitation on the Secretary's authority to *commence issuing* plates in an approved series. *Id.* ("The Secretary . . . shall not issue a series of special plates unless applications . . . have been received for 10,000 plates of that series."). This begs the question of who has the approval authority; nothing in the Illinois Vehicle Code addresses the Secretary's power to *approve* new specialty license plates. In practice, the Secretary has never issued specialty plates in a new series without a specific statutory enactment creating the series.

We need not resolve this aspect of the appeal. The amendment to section 5/3-600(a) makes explicit what the Secretary had argued was implicit: that the authority to *approve* new specialty license plates resides with the General Assembly.[4] Act of Aug. 23, 2007, Pub. Act No. 95-

---

[4] In addition to specifically challenging the rejection of its "Choose Life" license plate, CLI also claims the Illinois specialty-plate program is facially unconstitutional because it lacks any articulated standards governing (1) the Secretary's

(continued...)

0359 (amending 625 ILL. COMP. STAT. 5/3-600(a) to add the following: "The Secretary of State shall issue only special plates that have been authorized by the General Assembly."). We ordinarily apply the law in effect on appeal, and where (as here) a party requests only pro- spective relief, there is no impediment to doing so retro- actively. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 273 (1994) ("[A]pplication of new statutes passed after the events in suit is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not [impermissibly] retroactive.").

## B. Government Speech or Private Speech?

It is well established that when the government speaks, "it is entitled to say what it wishes[,] . . . [and] it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995) (citations

---

[4] (...continued)
discretion to authorize new plates (to the extent the Secretary had that authority), or (2) the state legislature's discretion to authorize new plates. The amendment to section 5/3-600 moots the first of these claims, and the second has no merit. It is axiomatic that one legislature cannot bind a future legislature. *Vill. of Rosemont v. Jaffe*, 482 F.3d 926, 937-38 (7th Cir. 2007) (citing *Reichelderfer v. Quinn*, 287 U.S. 315, 318 (1932)). The General Assembly is entitled to authorize specialty plates one at a time. It is not required to—and cannot—adopt "standards" to control its legislative discretion.

omitted); *see also Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 559-62 (2005); *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000); *Keller v. State Bar of Cal.*, 496 U.S. 1, 12-13 (1990). "[U]nits of state and local government are entitled to speak for themselves," *Hosty v. Carter*, 412 F.3d 731, 736 (7th Cir. 2005), and "[w]hen the government speaks[,] . . . it is, in the end, accountable to the electorate and the political process for its advocacy." *Southworth*, 529 U.S. at 235. "If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Id.*

Accordingly, when the government is the speaker, it may choose what to say and what *not* to say; it need not be neutral. Subject to other constitutional limitations not at issue here (such as the Establishment Clause), the constraints on the government's choice of message are primarily electoral, not judicial. While it is true that the government may not compel a person to "express a message he disagrees with, imposed by the government" (the "compelled speech" doctrine) or compel a person to "subsidize a message he disagrees with, expressed by a private entity" (the "compelled subsidy" doctrine), *see Johanns*, 544 U.S. at 557, neither of these principles is implicated here. (We will have more to say about *Johanns* in a moment.) It follows, then, that if the messages on specialty license plates in Illinois are the State's own speech, no private-speech rights are involved and CLI's remedy for the defeat of its "Choose Life" license plate is at the ballot box.

If, on the other hand, the messages on specialty license plates are not government speech, then the denial of

CLI's application for a "Choose Life" specialty plate is analyzed under the Supreme Court's "speech forum" doctrine. "The government violates the Free Speech Clause of the First Amendment when it excludes a speaker from a speech forum the speaker is entitled to enter." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 865 (7th Cir. 2006) (citing *Rosenberger*, 515 U.S. at 829-30; *Hosty*, 412 F.3d at 737). Judicial scrutiny in this context varies depending on the nature of the forum, and speech fora come in three basic varieties: traditional public, designated public, and nonpublic.

We will return to forum analysis later; the predicate question is whether the messages on specialty license plates are government speech, private speech, or a combination of the two. Other circuits are divided on the question. The Fourth and Ninth Circuits have held that messages on specialty license plates are private or hybrid speech; the Sixth Circuit has held that messages on specialty license plates are government speech. *Compare Ariz. Life Coal., Inc. v. Stanton*, 515 F.3d 956, 968 (9th Cir. 2008) (messages on specialty license plates in Arizona are private speech), *Planned Parenthood of S.C., Inc. v. Rose*, 361 F.3d 786, 794 (4th Cir. 2004) ("Choose Life" message on South Carolina specialty license plate is a mixture of government and private speech), *and Sons of Confederate Veterans*, 288 F.3d at 621 (messages on Virginia specialty license plates are private speech), *with Am. Civil Liberties Union of Tenn. v. Bredesen*, 441 F.3d 370, 376 (6th Cir. 2006) ("Choose Life" message on Tennessee specialty license plate is government speech).

The Fourth Circuit was the first to weigh in. In *Sons of Confederate Veterans*, the court was confronted with a First Amendment challenge to a Virginia statute authorizing a specialty license plate for an organization of descendants of Confederate Army veterans. The statute differed from others authorizing specialty plates for private organizations because it specifically prohibited the group's logo—which included the Confederate flag—from being displayed on the plate. 288 F.3d at 613-14. The Sons of Confederate Veterans cried foul, alleging viewpoint discrimination in violation of the First Amendment. Virginia argued in response that the specialty plate was government speech or, if it was not, that the restriction on the display of the Confederate flag was a reasonable content-based, not viewpoint-based, restriction.

The Fourth Circuit began its analysis by adapting an approach developed by the Tenth Circuit in a case involving a First Amendment challenge to a holiday display featuring joint public and private sponsorship. *Id.* at 618 (citing *Wells v. City & County of Denver*, 257 F.3d 1132, 1141 (10th Cir. 2002)). To determine whether the speech at issue was governmental or private, the court weighed the following factors:

> (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal speaker"; and (4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech . . . .

*Id.* (quoting *Wells*, 257 F.3d at 1141).

Applying this framework, the court noted that Virginia's specialty-plate program had dual purposes: the collection of revenue for the State and the facilitation of expression by private organizations and their members. *Id*. at 620-21. The court also observed that the State generally exercised minimal editorial control over the content of specialty license plates because it usually accepted the designs submitted by the sponsoring organizations. *Id*. at 621. Finally, the court noted that although specialty license plates (like other license plates) were technically the property of the State, the owners of the vehicles on which they were mounted were the "literal speakers" and bore "ultimate responsibility" for the messages contained on the plates. *Id.* at 621-22. The court concluded that the messages on Virginia's specialty license plates were predominantly private rather than government speech. *Id*. The court went on to hold that the Virginia statute's logo restriction amounted to viewpoint discrimination within a forum for private speech. *Id.* at 626.

The Fourth Circuit returned to this subject just two years later in *Rose*, a case involving a challenge to South Carolina's "Choose Life" specialty license plate. The statute at issue provided that proceeds from the sale of the "Choose Life" plate were to be distributed to local private crisis pregnancy agencies—but not to those that performed or promoted abortion services. *Rose*, 361 F.3d at 788. Planned Parenthood of South Carolina challenged the statute shortly after it was adopted. The Fourth Circuit consulted the factors identified in *Sons of Confederate Veterans* but fine-tuned its analysis. Rejecting South Carolina's argument that its "Choose Life" specialty plate was government speech, the court determined that the

plate "embodie[d] a mixture of private and government speech." *Id.* at 793.

The indicators of government speech were more strongly present in *Rose* than in *Sons of Confederate Veterans.* For example, South Carolina's "Choose Life" license plate had its origins in the state legislature rather than a private sponsoring organization; two lawmakers acting on their own had initiated the legislative effort. Other factors, however—notably that individual vehicle owners became the "literal speakers" with "ultimate responsibility" for the speech when they purchased and displayed the "Choose Life" plate on their vehicles—led the court to conclude that the license-plate message was a form of hybrid speech, both governmental and private. *Id.* at 793-94. The private-speech attributes of the specialty plate were substantial enough to analyze the case under nonpublic forum doctrine, testing for viewpoint neutrality. *Id.* at 798. The "Choose Life" plate flunked. *See id.* at 799 ("South Carolina has impermissibly favored the pro-life viewpoint by authorizing the Choose Life plate.").

The following year the Supreme Court decided *Johanns*, elaborating on the government-speech doctrine in the context of an alleged "compelled subsidy." *Johanns* was a First Amendment challenge by a group of beef producers to a special federal assessment imposed on heads of cattle and used to fund a promotional campaign encouraging the consumption of beef. The advertising featured, among other things, the catchy "Beef. It's What's for Dinner" slogan. *Johanns*, 544 U.S. at 553-55. The complaining ranchers argued that the federal government

could not constitutionally compel them to subsidize a private message.

The Supreme Court held that the assessment did not amount to a compelled subsidy of a private message because the promotional campaign was entirely the government's speech. *Id*. at 560-62. Congress had established the framework for the promotional program in the Beef Promotion and Research Act of 1985 and directed the Secretary of Agriculture to implement it via a Cattlemen's Beef Promotion and Research Board, whose members were appointed by and answerable to the Secretary. *Id.* at 553-54. The Beef Board, in turn, convened an Operating Committee composed of Beef Board members and representatives appointed by a federation of state beef councils. *Id.* The ranchers argued that the advertising could not be considered government speech because it was actually developed by the Operating Committee, some of whose members were private beef-industry representatives. *Id.* at 560.

The Court disagreed, holding that "[t]he message set out in the beef promotions is from beginning to end the message established by the Federal Government." *Id.* The program was established by Congress, and the Secretary of Agriculture implemented and retained ultimate control over it. *Id.* at 561. "When, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages." *Id*. at 562.

Relying almost entirely on *Johanns*, a divided panel of the Sixth Circuit broke with the Fourth Circuit and held in *Bredesen* that Tennessee's "Choose Life" specialty license plate was government speech, implicating no speech rights of private speakers whatsoever. 441 F.3d at 380. The *Bredesen* majority thought *Johanns* established a new test for government speech, applicable in all contexts, and on this basis declined to follow the Fourth Circuit's lead in *Rose.* "The *Johanns* standard," the court held, "classifies the 'Choose Life' message [on Tennessee's specialty plate] as government speech." *Id.*

The Court's conclusion in *Johanns* had been driven by the federal government's pervasive and complete control—"from beginning to end"—over the beef-promotion message. 544 U.S. at 560. The Sixth Circuit believed the same total governmental control was evident in *Bredesen.* The Tennessee legislature had consulted with New Life Resources, a private, nonprofit pregnancy-assistance organization, on the design of the "Choose Life" plate; the statute authorizing the plate also directed that New Life was to receive half the profits from its sale. *Bredesen*, 441 F.3d at 372. But because the Tennessee legislature "chose the 'Choose Life' plate's overarching message and approved every word to be disseminated," the court held that "*Johanns* supports classifying 'Choose Life' on specialty license plates as the State's own message." *Id.* at 376.

That specialty license plates involve additional private speakers—the individual vehicle owners who carry the messages on their cars—did not alter the Sixth Circuit's analysis. On this point, the court distinguished *Wooley v.*

*Maynard*, 430 U.S. 705 (1977), a "compelled speech" case involving a New Hampshire vehicle owner who repeatedly obliterated the state's motto, "Live Free or Die," from his license plate. After multiple convictions and a jail term for violating the State's vehicle code, the vehicle owner sought and obtained a federal-court injunction against further enforcement of the State's license-plate statute. The Supreme Court affirmed, noting that the State's license-plate statute "in effect requires that [vehicle owners] use their private property as a 'mobile billboard' for the State's ideological message or suffer a penalty." *Id.* at 715. This, the Court held in *Wooley*, was a form of coerced speech, impermissible under the First Amendment. *Id.* at 716-17.

Not so in *Bredesen*, said the Sixth Circuit; no vehicle owner is compelled to carry Tennessee's "Choose Life" message. 441 F.3d at 377-78. From this unremarkable observation the court extrapolated the following conclusion: Because display of a specialty license plate is voluntary, not compulsory, Tennessee had not created a forum for private speech. *Id.* at 378. This strikes us as a non sequitur. As Judge Martin noted in dissent, if messages on license plates implicated no private-speech interests *at all*, then *Wooley* (among other cases) would have come out differently. *See id.* at 386 (Martin, J., dissenting). Judge Martin also noted that the First Amendment harm in the "compelled speech" or "compelled subsidy" context is the *compulsion*—in the former, being compelled against one's conscience to utter the government's preferred message, and in the latter, being compelled to subsidize someone else's private message. *See id.* at 385-86. The

First Amendment harm in the specialty-plate context, on the other hand, is "being denied the opportunity to speak on the same terms as other private citizens within a government sponsored forum." *Id.* at 386. We think Judge Martin has it exactly right.

The Ninth Circuit did, too, in *Arizona Life Coalition, Inc. v. Stanton*, a case very much like our own. The Arizona License Plate Commission denied the Arizona Life Coalition's application for a "Choose Life" specialty license plate, and the group sued, alleging a violation of its members' free-speech rights and asking the court to order the Commission to issue the plate. The Ninth Circuit viewed the Sixth Circuit's decision in *Bredesen* as a misapplication of *Johanns* and declined to follow it. *Stanton*, 515 F.3d at 964-65.

The court found *Johanns* instructive, however, in that the Supreme Court had focused on some of the same factors the Fourth Circuit had identified as important in *Sons of Confederate Veterans.* Applying the Fourth Circuit's four-factor test, the court in *Stanton* concluded that messages on specialty license plates in Arizona were not government speech; instead, as in *Sons of Confederate Veterans* and *Rose*, messages on specialty license plates in Arizona should be treated as private speech and subjected to forum analysis. *See id.* at 968. The court held that the forum was a limited one (more precisely, a nonpublic forum), meaning that "any access restriction must be viewpoint neutral and reasonable in light of the purpose served by the forum." *Id.* at 971. Finally, the court concluded that the Commission's exclusion of the "Choose

Life" message was viewpoint discriminatory and ordered the Commission to approve the plate. *Id.* at 971-73.

We will come back to this last point in a moment. For now, we pause to note that what emerges from this trip through license-plate caselaw is that the Sixth Circuit stands alone in holding that specialty license plates implicate *no* private-speech rights at all. We think this conclusion is flawed for the reasons we have noted and instead find the approach of the Fourth and Ninth Circuits more persuasive. Their multi-factor test can be distilled (and simplified) by focusing on the following inquiry: Under all the circumstances, would a reasonable person consider the speaker to be the government or a private party? Factors bearing on this analysis include, but are not limited to, the degree to which the message originates with the government, the degree to which the government exercises editorial control over the message, and whether the government or a private party communicates the message.

Applying this approach here, we arrive at the same conclusion as in *Sons of Confederate Veterans*, *Rose*, and *Stanton*: Messages on specialty license plates cannot be characterized as the government's speech. Like many states, Illinois invites private civic and charitable organizations to place their messages on specialty license plates. The plates serve as "mobile billboards" for the organizations and like-minded vehicle owners to promote their causes and also are a lucrative source of funds. Editorial control over the message is shared between the sponsoring organization and the State; the

organization typically develops the plate design, subject to the State's authority to modify it. The most obvious speakers in the specialty-plate context are the individual vehicle owners who choose to display the specialty plates and the sponsoring organizations whose logos or messages are depicted on the plates. The State can reasonably be viewed as having approved the message; it is commonly understood that specialty license plates require State authorization. Nonetheless, specialty-plate messages are most closely associated with drivers and the sponsoring organizations, and the driver is the ultimate communicator of the message. In short, we agree with the Fourth and Ninth Circuits that there are enough elements of private speech here to rule out the government-speech doctrine; the messages on Illinois specialty license plates are not government speech. Because private-speech rights are implicated, we proceed to First Amendment forum analysis.

## C. What Kind of Forum?

As we have already noted, the Supreme Court has identified three types of speech fora: traditional public, designated public, and nonpublic. "In an open or traditional public forum, state restrictions on speech get strict scrutiny." *Christian Legal Soc'y*, 453 F.3d at 865 (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 391 (1993); *Widmar v. Vincent*, 454 U.S. 263, 269-79 (1981); *Hosty*, 412 F.3d at 736-37). Speakers may be excluded from an open or traditional public forum only when

"necessary to serve a compelling state interest" and when the exclusion is "narrowly drawn to achieve that interest*." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *see also Christian Legal Soc'y*, 453 F.3d at 865. A traditional public forum is public property that "by long tradition or by government fiat . . . has been devoted to assembly and debate," such as a public street or square. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Government creates a "designated public forum" when it "intentionally open[s] a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802; *see also Christian Legal Soc'y*, 453 F.3d at 865. Strict scrutiny applies here as well. *Christian Legal Soc'y*, 453 F.3d at 865 (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 667 (1998)).

All other government property is considered under the rubric of "nonpublic forum"—property that "is not by tradition or design a forum for public communication." *Perry Educ. Ass'n*, 460 U.S. at 46; *see also Good News Club*, 533 U.S. at 106. Restrictions on speech within a nonpublic forum must not discriminate on the basis of viewpoint and "must be reasonable in light of the forum's purpose." *Good News Club*, 533 U.S. at 106-07 (citing *Cornelius*, 473 U.S. at 806); *Forbes*, 523 U.S. at 682; *Rosenberger*, 515 U.S. at 829; *Lamb's Chapel*, 508 U.S. at 392-93.

Specialty license plates are an unusual species of forum—certainly not a traditional public forum, and we think not a designated public forum, either. Illinois hasn't opened this particular property for general public dis-

course and debate. "[T]he government need not permit all forms of speech on property that it owns and controls," *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992), and it "does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse," *Cornelius*, 473 U.S. at 802. Relevant factors in the analysis include "the policy and practice of the government" and "the nature of the property and its compatibility with expressive activity." *Id.*

These factors weigh against a conclusion that specialty license plates are a designated public forum. License plates in Illinois, as elsewhere, are heavily regulated by policy and practice. *See* 625 ILL. COMP. STAT. 5/3-100 *et seq.*, 5/3-400 *et seq.*, 5/3-600 *et seq.* Their primary purpose is to identify the vehicle, not to facilitate the free exchange of ideas. License plates are not by nature compatible with anything more than an extremely limited amount of expressive activity. We conclude that specialty license plates are a forum of the nonpublic variety, which means that we review CLI's exclusion from that forum for viewpoint neutrality and reasonableness.

**D. Viewpoint Neutrality and Reasonablness**

Within a nonpublic forum, the Supreme Court has recognized "a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of th[e] limited forum, and on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise

within the forum's limitations." *Rosenberger*, 515 U.S. at 829-30. Distinguishing between a permissible content-based restriction and an impermissible viewpoint-based restriction is not always easy. *Id.* at 831 (acknowledging that the distinction between content and viewpoint discrimination "is not a precise one").

The difference between content and viewpoint discrimination was more readily apparent in *Sons of Confederate Veterans* and *Rose* than it is here. Excluding the Confederate flag from a specialty-plate design (*Sons of Confederate Veterans*) and authorizing a "Choose Life" specialty plate without permitting a plate for those who wish to espouse the pro-choice viewpoint (*Rose*) were fairly obvious instances of discrimination on account of viewpoint. Virginia was not imposing a "no flags" rule; it was prohibiting the display of a specific symbol commonly understood to represent a particular viewpoint. South Carolina was favoring one viewpoint on the subject of abortion over any other.

Here, in contrast, Illinois has excluded the entire subject of abortion from its specialty-plate program. The Secretary argues this is a content-based but viewpoint-neutral restriction. We agree. Illinois has not favored one viewpoint over another on the subject of abortion (*Rose*) or prohibited the display of a viewpoint-specific symbol (*Sons of Confederate Veterans*). Instead, the State has restricted access to the specialty-plate forum on the basis of the *content* of the proposed plate—saying, in effect, "no abortion-related specialty plates, period." This is a permissible content-based restriction on access to the

specialty-plate forum, not an impermissible act of dis-
crimination based on viewpoint.

We noted earlier that the Ninth Circuit came to the
opposite conclusion in *Stanton*, and our disagreement
with this aspect of its analysis requires some explanation.
Like the Secretary here, Arizona's License Plate Commis-
sion argued in *Stanton* that it had rejected the "Choose
Life" specialty plate not because of the viewpoint it
expressed but because the State did not wish to entertain
specialty plates on *any* aspect of the abortion debate.
Because the State had *no* specialty license plates expressing
*any* view on the abortion issue, the Commission main-
tained that its rejection of the "Choose Life" plate was a
viewpoint-neutral restriction on access to the specialty-
plate forum. The Ninth Circuit rejected this argument:
"Preventing Life Coalition from expressing its viewpoint
out of a fear that other groups would express opposing
views seems to be a clear form of viewpoint discrimina-
tion." *Stanton*, 515 F.3d at 972.

The Ninth Circuit's conclusion on this point relied
heavily on a passage from *Rosenberger* in which the
justices in the majority were responding to an argument
made by the dissent. At issue in *Rosenberger* was a
public university's exclusion of a faith-based student
newspaper from student activity funding in accordance
with a university policy that prohibited the funding of
organizations that "primarily promote[ ] or manifest[ ] a
particular belie[f] in or about a deity or an ultimate real-
ity." 515 U.S. at 823. The Supreme Court held this was
impermissible viewpoint discrimination within a speech

forum in violation of the First Amendment. The dissenting justices argued that the university's policy was not viewpoint discriminatory because it excluded *all* religious speech. *Id.* at 892-96 (Souter, J., dissenting). The Court responded as follows:

> The dissent's assertion that no viewpoint discrimination occurs because the Guidelines discriminate against an entire class of viewpoints reflects an insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech. Our understanding of the complex and multifaceted nature of public discourse has not embraced such a contrived description of the marketplace of ideas. If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint.

*Id.* at 831.

This passage actually undermines the Ninth Circuit's conclusion. Excluding a faith-based publication from a speech forum *because* it is faith based is indeed viewpoint discrimination; where all other perspectives on the issues of the day are permitted, singling out the religious perspective for exclusion is discrimination based on viewpoint, not content. In contrast, here (and in *Stanton,* too), the State has effectively imposed a restriction on access to the specialty-plate forum based on subject

matter: no plates on the topic of abortion. It has not disfavored any particular perspective or favored one perspective over another on that subject; instead, the restriction is viewpoint neutral.[5]

This leaves the question of reasonableness. We have no trouble accepting the Secretary's argument that the restriction is reasonable. Although the messages on specialty license plates are not government speech, they *are* reasonably viewed as having the State's stamp of approval. License plates are, after all, owned and issued by the State, and specialty license plates in particular cannot come into being without legislative and gubernatorial authorization. To the extent that messages on specialty license plates are regarded as approved by the State, it is reasonable for the State to maintain a position of neutrality on the subject of abortion.

Our conclusion is consistent with a decision of the Second Circuit in the related context of vanity license plates. In *Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001), the court was confronted with a First Amendment challenge by a Vermont vehicle owner whose vanity license plate, "SHTHPNS," was rejected by the State Department of Motor Vehicles. The Vermont statute governing vanity

---

[5] We note in addition that *Stanton*'s conclusion is in tension with *Rose*. The Fourth Circuit said in *Rose* that it is viewpoint discrimination to *allow* a "Choose Life" specialty plate in the absence of a pro-choice plate. 361 F.3d at 795. The Ninth Circuit said in *Stanton* that it is viewpoint discrimination to *disallow* a "Choose Life" specialty plate even when there is no pro-choice plate. 515 F.3d at 972.

license plates barred any arrangement of letters and numbers that produced an offensive message, and "SHTHPNS" was deemed offensive. The Second Circuit concluded that Vermont's vanity-license-plate program was a nonpublic forum and the State's rejection of this license plate was both viewpoint neutral and reasonable. *Id.* at 167-70. "Vermont's restriction on scatological terms—what the Vermont statute describes as 'offensive'—reasonably serves legitimate governmental interests." *Id.* at 169. Because license plates are governmental property and "inevitably . . . will be associated with the state that issues them," the State has a legitimate interest in not communicating "offensive scatological terms." *Id.* Vermont did not prohibit the plate because it represented the view "'Shit happens (so don't let life's problems drive you to drink),'" but because the vehicle owner used "a combination of letters that stands in part for the word 'shit.'" *Id.* at 170.

Because the General Assembly's rejection of the "Choose Life" specialty plate was viewpoint neutral and reasonable, there was no First Amendment violation here, and the district court improperly entered judgment for CLI. We REVERSE the judgment of the district court, VACATE its order directing the Secretary to issue the "Choose Life" plate, and REMAND with instructions to enter judgment for the Secretary.

MANION, *Circuit Judge,* concurring. I agree with the court's conclusion that Illinois' specialty plate program, as set forth in amended 625 Ill. Comp. Stat. 5/3-600, does not constitute government speech.[6] I also agree with the court's conclusion that Illinois' specialty plate program is most aptly characterized as a non-public forum. As such, any restriction on speech must not discriminate on the basis of viewpoint and must be reasonable in light of the forum's purpose. *See* Opinion at 24. I write separately, however, to stress three points.

First, the court in its opinion concludes that it is undisputed that Illinois decided to exclude "the *entire subject* of abortion from its specialty-plate program." Opinion at 25 (emphases added). However, I have some reservations with this conclusion. This is nothing more than the Illinois legislature rejecting efforts to approve a single specialty license plate, "Choose Life." As the court noted, those efforts were thwarted initially in the Illinois Senate and later in the House (the proposal died in a House subcommittee). By rejecting a "Choose Life" plate, it is not clear to me that the legislature decided to exclude "the *entire subject* of abortion." Nevertheless, with that assumption I would then agree that the exclusion of the entire subject is a content-based restriction and not one based on viewpoint.

---

[6] I likewise agree that the amendment by the Illinois legislature effectively moots the district court's opinion by expressly requiring legislative approval of any license plate message before the Secretary of State may issue new specialty plates.

Second, I disagree with the district court's (and other courts') characterization of the "choose life" message as simply a pro-life statement. It is more than that. The message acknowledges both choice and life, so most people who claim to be pro-life and a large number of people who claim to be pro-choice but personally opposed to abortion should be comfortable with this message that is directed at pregnant women who are contemplating abortion. This petition expressly recognizes that it is the woman's choice. But at the same time it recognizes that the life of the developing baby is also at stake.

Although there are extremes on both sides of the abortion issue, the "choose life" message covers a much broader middle ground. Many, if not most (especially politicians, as this issue comes up every election season) who claim to be pro-choice also frequently and I presume sincerely claim to be personally opposed to abortion. Yet they recognize that for a woman faced with an unwanted pregnancy, whether or not to terminate will be an extremely difficult decision. For whatever reason they are personally opposed to abortion, they want the final decision to be with the woman. Still, it seems that these people want to at least greatly reduce the number of abortions and even make them "rare." Additionally, many proclaim strong support for adoption. But before there is adoption, someone has to intervene and be an advocate for the unborn child in order to encourage the mother to carry her baby to term. Most people who claim to be pro-life recognize that the Supreme Court has created a right of privacy that engulfs the right to choose to have an abortion. With that in mind, most pro-

life people would want to do whatever is possible to encourage the woman to choose life for her unborn baby. Thus it would seem to be a natural combination for people who are pro-choice but personally opposed to abortion, and those who are pro-life but recognize that ultimately it's the woman's decision, to join together and encourage women in that difficult position to choose life.

While Illinois has decided to exclude the choose-life subject from its specialty plate program, other states might recognize the combined forces of people who are pro-choice but personally opposed, and people who are pro-life but who acknowledge that legally it is the mother's choice. This combination of people would be willing to accept a "Choose Life" plate, as such a plate does not express any opinion on the legality of abortion. There are organizations that counsel pregnant women who are questioning whether or not to have an abortion. These counselors provide genuine compassion and concern for the woman with an unexpected or even unwanted pregnancy. Their hope is that, with expert counseling, state of the art ultrasounds, prenatal care, and many other services, the pregnant woman would make an informed final decision for her developing child. Support for the mother and baby after birth could include baby cribs, parenting classes, and other follow-up services. All of this would be the hoped-for result for those who are pro-life, as well as those who are pro-choice but personally opposed to abortion.

The bottom line is that the "choose life" message can be placed on two sides of the same coin, which includes concern and compassion for the expectant mother and

concern for the future life of her unborn baby. Illinois has chosen to exclude this subject from its specialty plate program. However, for states that choose to include the issue, the "choose life" combination is one that a solid legislative majority could comfortably approve.

Third and finally, it is important to stress that for those states which have approved a "Choose Life" plate, that, by itself, does not demonstrate viewpoint discrimination based on the absence of other specialty plates related to the topic of abortion. A "Choose Life" plate does not speak to whether abortion should be legal, but instead recognizes that under our legal system only pregnant women can choose whether or not to have an abortion. The message simply recommends that a woman contemplating abortion choose life for her unborn child. But rather than devolve into the contentious debate about viewpoints concerning the legality of abortion, a state could reasonably seek to promote a common middle ground—shared by both those who support and those who object to the Supreme Court's decision to legalize abortion. States which find the "Choose Life" plate provides a positive non-confrontational area of shared consensus act reasonably in that conclusion and do not engage in viewpoint discrimination. On the other hand, for now, Illinois can reasonably conclude that it does not want its license plates to mention anything related to abortion.

For these reasons, I concur.